DEPARTMENT OF NATURAL RESOURCES v SEAMAN

Docket Nos. 55942–55944. Argued May 7, 1975 (Calendar No. 6).—
    Decided April 1, 1976.

The Department of Natural Resources brought three actions for
confiscation and condemnation of fish, fishing equipment, and a
commercial fishing boat against J. Avis McGahan Seaman and
Duane L. Seaman for commercial fishing in violation of depart-
ment regulations and restrictions in their commercial fishing
license. The Iosco Circuit Court, Allan C. Miller, J., entered an
order of confiscation and condemnation. The Court of Appeals,
Bronson, P. J., and Quinn and Van Valkenburg, JJ., affirmed
(Docket Nos. 16365–16367). Defendants appeal, asserting that
the Commercial Fishing Law unconstitutionally delegates au-
thority to the Director of Natural Resources, that the fishing
rules of the Department of Natural Resources exceed the
authority of the department, and that their boat and equip-
ment and fish were taken in an unconstitutional search and
seizure. *Held:*

1. The section of the Commercial Fishing Law which autho-
rizes the Department of Natural Resources to place restrictions
on commercial fishing licenses is not an unconstitutional dele-
gation of legislative authority. The statutory standards to guide
the department in issuing commercial fishing licenses, the
primary goal being the protection and preservation of the
fisheries of the state, are as reasonably precise as the subject
matter permits. The Legislature has provided the necessary
flexibility for effective management of fisheries by giving the
department limited discretion, not arbitrary power, to regulate
the commercial taking of fish.

2. The rules of the department and restrictions in commer-

REFERENCES FOR POINTS IN HEADNOTES

[1–3, 16] 1 Am Jur 2d, Administrative Law §§ 100–130, 221–226.
[4, 6–8] 35 Am Jur 2d, Fish and Game § 45.
[5, 9] 35 Am Jur 2d, Fish and Game § 6.
[10–12, 14] 5 Am Jur 2d, Arrest §§ 26, 28.
    68 Am Jur 2d, Searches and Seizures §§ 35–59.
[13] 68 Am Jur 2d, Searches and Seizures §§ 116, 117.
[14, 15, 17] 35 Am Jur 2d, Fish and Game § 54.

cial fishing licenses limiting the use of small-mesh gill nets do not exceed the authority given the department by statute. The language in the statute which allows the department to limit the number of licenses issued and to determine the qualifications of the licensees authorizes the department to place on licenses reasonable restrictions not spelled out in the act.

3. The statute authorizing conservation officers to conduct a search without a warrant must be construed to require exigent circumstances to justify such a search. In the instant case there were no exigent circumstances. The officers had probable cause to believe that the defendants were conducting illegal fishing operations well before the search, the vessel was moored at its berth, and there was no indication that the defendants were about to leave or attempt to dispose of the incriminating evidence. The facts suggest that there was ample time to obtain a valid search warrant. Under these circumstances the search was unconstitutional and the subsequent seizure of the vessel illegal. The defendants are entitled to the return of their property.

Kavanagh, C. J., with whom Levin, J., concurred, concurred in upholding the validity of the statute authorizing restrictions on commercial fishing licenses and the validity of the DNR rule, and agreed that the seizure of the defendant's vessel without a warrant was unlawful and that the defendants are entitled to return of their property. The existence of probable cause to believe the vessel was being used illegally cannot justify a search or seizure without a warrant absent exigent circumstances. The statute which purports to authorize seizure of the vessel without a warrant does not serve as a justification for the seizure. The statute must yield to the right to be secure against searches and seizures unless the statute itself falls within one of the exceptions to the warrant requirement. The fact that the proceeding for forfeiture of the vessel is civil does not take it out of the Fourth Amendment's protection.

Levin, J., also wrote a separate concurring opinion because, while he agrees that the statute does not constitute an unconstitutional delegation of authority and that the Director of Natural Resources has been given reasonable discretion to act in accordance with legislatively provided guidelines, he does not agree that the statute must itself contain standards to guide the exercise of delegated authority. He also concurred in the conclusion that the vessel must be returned. He is of the opinion that the Supreme Court, on a proper record, should consider whether forfeiture of property for use in excess of authorization—in contrast with forfeiture for manufacture or

transportation of contraband—is consistent with relevant constitutional principles.

The matter is remanded to the Iosco Circuit Court for further proceedings.

53 Mich App 192; 218 NW2d 813 (1974) reversed in part and affirmed in part.

OPINION OF THE COURT

1. ADMINISTRATIVE LAW—DELEGATION OF POWERS.

The Legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend.

2. ADMINISTRATIVE LAW—DELEGATION OF POWERS—DISCRETION—STANDARDS.

In determining whether the limits on the exercise of discretion conferred on an administrative official are sufficiently defined to avoid delegation of legislative powers, it must be borne in mind that standards must be sufficiently broad to permit efficient administration in order to carry out properly the policy of the Legislature but not so broad as to leave the people unprotected from uncontrolled, arbitrary power in the hands of the administrative officials.

3. ADMINISTRATIVE LAW—DELEGATION OF POWERS—STATUTES.

The guiding principles in determining whether a statute provides sufficient standards for the exercise of discretion of an administrative official are: (1) the provision in question should not be isolated but must be construed with reference to the entire act; (2) the standard should be as reasonably precise as the subject matter requires or permits; and (3) if possible the statute must be construed in such a way as to render it valid, not invalid, as conferring administrative, not legislative power, and as vesting discretionary, not arbitrary, authority.

4. FISH—COMMERCIAL FISHING LAW—DEPARTMENT OF NATURAL RESOURCES—LICENSES—STANDARDS.

The legislative policy and standards in the Commercial Fishing Law to guide the Department of Natural Resources in issuing commercial fishing licenses are to protect and preserve the fisheries of the state and to allow the taking of fish conditioned upon a grant of permission in the form of a license, but only when such taking will not disrupt the primary goal of protection and preservation (MCL 308.1b).

5. Fish—Commercial Fishing Law—Department of Natural Resources.

The Department of Natural Resources has been given the authority to determine factually the nature and degree of commercial fishing, in terms of species, location, and types of fishing gear, which may be allowed without affecting the goal of protection and preservation of the fisheries of the state (MCL 308.1b).

6. Fish—Commercial Fishing Law—Department of Natural Resources—Licenses—Standards.

The standard in the Commercial Fishing Law for the issuing of commercial fishing licenses is as reasonably precise as the subject matter requires or permits in view of the difficulty and complexity of the management of natural resources (MCL 308.1b).

7. Fish—Commercial Fishing Law—Director of Conservation—Licenses—Delegation of Power.

The section of the Commercial Fishing Law which authorizes the Director of Conservation to place restrictions on commercial fishing licenses is not an unconstitutional delegation of legislative authority (MCL 308.1b).

8. Fish—Commercial Fishing Law—Licenses—Restrictions.

The language in the Commercial Fishing Law that the Director of Conservation (Department of Natural Resources), when in his opinion it is necessary for the better protection, management, harvesting and utilization of the fisheries, may limit the number of fishing licenses to be issued and fix and determine the qualifications of such licensees authorizes the director to place on licenses reasonable restrictions not specifically spelled out in the statute, such as a prohibition of the use of gill nets of less than eight inches mesh size in certain fishing zones (MCLA 308.1b).

9. Fish—Commercial Fishing Law—Department of Natural Resources—Rules.

A Department of Natural Resources rule which prohibits the use of gill nets of less than eight inch mesh in certain fishing zones does not exceed the authority granted the Department of Natural Resources by the Legislature in the Commercial Fishing Law (1970–1971 AACS, R 299.883).

10. Searches and Seizures—Without Warrant—Constitutional Law—Probable Cause—Exigent Circumstances.

A search without a warrant in order to be reasonable under the

Fourth Amendment requires more than probable cause—exigent circumstances must also be present (US Const, Am IV).

11. SEARCHES AND SEIZURES—CONSERVATION OFFICERS—EXIGENT CIRCUMSTANCES.

The statute providing that conservation officers may search boats without a warrant must be construed as requiring the presence of exigent circumstances before conservation officers are authorized to conduct a search without a warrant (MCL 300.12).

12. SEARCHES AND SEIZURES—WITHOUT WARRANT—FISHING BOATS.

The search without a warrant of defendants' fishing boat constituted an unreasonable search in violation of the Federal and state Constitutions where no exigent circumstances existed because conservation officers had the defendants under surveillance for more than a day prior to boarding the vessel and had established probable cause to believe that defendants were conducting illegal fishing operations well before the actual search took place, the vessel was moored at its berth and there was no indication that the defendants were about to leave or attempt to dispose of the incriminating evidence, and the officers had ample time to obtain a valid search warrant (US Const, Am IV; Const 1963, art 1 § 11).

13. SEARCHES AND SEIZURES—ILLEGAL SEARCH—RETURN OF PROPERTY.

When property has been wrongfully seized following an invalid search, the property should be returned to the owner.

CONCURRING OPINION

KAVANAGH, C. J., and LEVIN, J.

See headnotes 7–10.

14. SEARCHES AND SEIZURES—CONSERVATION OFFICERS—EXIGENT CIRCUMSTANCES.

*A statute which purports to authorize seizures of boats by conservation officers without a warrant must yield to the right to be secure against unreasonable searches and seizures absent exigent circumstances (MCL 300.12; MSA 13.1222).*

15. SEARCHES AND SEIZURES—FORFEITURES—FOURTH AMENDMENT.

*Suits for penalties and forfeitures incurred by the commission of offenses against the law are quasi-criminal in nature and within the reason of criminal proceedings for all purposes of the Fourth Amendment (US Const, Am IV).*

CONCURRING OPINION

LEVIN, J.

See headnotes 7, 8, 11, and 13.

16. ADMINISTRATIVE LAW—STATUTES—DELEGATION OF POWER.

  *A statute which delegates discretionary power need not itself contain standards to guide the exercise of the delegated power.*

17. LICENSES—SEARCHES AND SEIZURES—FORFEITURE OF PROPERTY.

  *The Supreme Court should consider on a proper record whether forfeiture of property used in excess of authorization in a regulated vocational or avocational pursuit—in contrast with forfeiture for manufacture or transportation of contraband—is consistent with constitutional principles.*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Ronald R. Tyler,* Prosecuting Attorney, for plaintiff.

*Nino E. Green,* for defendants.

WILLIAMS, J. This case comes before us on appeal from three condemnation and confiscation orders entered by the Iosco Circuit Court against the defendants for acts of illegal fishing. The issues raised on appeal are: 1) does § 1b(2) of Commercial Fishing Law,[1] which authorizes the Director of Conservation (Director of Natural Resources) to place restrictions on commercial fishing licenses, constitute an unconstitutional delegation of legislative authority?; 2) does Rule 3 of Order No. 17 (revised)[2] exceed the authority granted the Department of Natural Resources by the Legislature in the Commercial Fishing Law?; and 3) did the warrantless search of defendants' vessel constitute an unreasonable search in violation of the Fourth Amendment to the United States Constitution and article 1, § 11 of the Michigan Constitution?

---

[1] 1929 PA 84 as amended. MCLA 308.1b; MSA 13.1491(2).

[2] 1970–1971 AACS, R 299.883.

We find that § 1b(2) of the Commercial Fishing
Law does not constitute an unconstitutional dele-
gation of legislative authority, nor does Rule 3 of
Order No. 17 (revised) exceed the DNR's authority
as granted by the Legislature. However, we do find
that the conservation officers conducted an illegal
search in violation of the Constitution, and as a
result defendants are entitled to the return of
their vessel, which was wrongfully seized.

## I—FACTS

In 1972 the DNR issued defendants a commer-
cial fishing license. In accordance with DNR Order
No. 17, Rule 3[3] and other DNR regulations, the
license restricted the number and types of nets to
be used by the defendants in certain areas or
"zones" of the Great Lakes. The defendants pro-
tested one restriction in particular which limited
the use of gill nets to those with mesh sizes of 8
inches or more. Defendants had been accustomed

---

[3] DNR Order No. 17, Rule 3 provides pertinently:
"Rule 3. Except as otherwise restricted by Act No. 84 of the Public
Acts of 1929, as amended, being sections 308.1 to 308.48 of the
Compiled Laws of 1929 *[sic]*, and commercial fishing rules, commercial
fishing is permitted as prescribed in the following zones or as autho-
rized by written permission of the director of natural resources or his
representative.

     * * *

"Zone 19-Lake Huron not otherwise described herein. Large mesh
gill nets 8 inches or larger are permitted in depths less than 5
fathoms south of a line running due east from the Black River,
section 14, T28N, R9E, to the international boundary. Trap nets are
permitted from April 1 to May 31, and from September 15 to Novem-
ber 30 in an area north and east of Sand Point within the following
described boundaries: commencing at the monument on the westerly
tip of Sand Point; thence easterly to the section line between section
7, T17N, R10E, and section 12, T17N, R9E; thence on a line due north
for 2 miles; thence on a line due west to a point due north of the
monument on Sand Point; thence southerly to the point of beginning"
The fishing violations which are the subject matter of this case
occurred in Zone 19.

to using gill nets with a mesh size of 2-1/2 to 2-7/8 inches.[4]

Contrary to the provisions of the license, defendants continued to use the 2-1/2-inch mesh gill nets.[5] On three separate occasions DNR officials after observing defendants conducting illegal fishing activities seized fish and/or equipment in the possession of the defendants.

The first seizure took place on May 11, 1972. After observing defendants' activities and obtaining a search warrant, DNR officials boarded defendants' vessel and seized a quantity of chubs (a species of protected fish). The next day officers seized a buoy and ten boxes of gill nets from the open waters of Lake Huron in an area where the defendants had been observed tending their nets.

On October 3, 1972, the third seizure was made after DNR officials had conducted the search which is now being challenged. The day before the search and subsequent seizure, conservation officers, suspecting that defendants were again violating provisions of their license, set up an observation post on the shores of Lake Huron and at dusk observed what apparently was the defendants' vessel setting nets. Unable to further investigate due to darkness, they set out the following morning to examine the area. By 7:30 a.m., October 3, 1972, the officers had established the presence of illegal gill nets which belonged to the defendants. After marking these nets, the officers withdrew from the area but kept it under surveillance. In

_____

[4] At the circuit court and Court of Appeals the question was raised whether the defendants could properly be charged with violating the provisions of the 1972 license since they had protested the new provisions and had not as yet been afforded the statutorily-required hearings. The question is not crucial here because as the Court of Appeals pointed out the use of small-mesh gill nets in Zone 19 was also not permitted under the 1971 license.

[5] Defendants reported their activity to the DNR on a monthly basis.

the early evening DNR officials observed the defendants' vessel apparently in the process of tending its nets and then heading for its mooring at the Oscoda docks. At approximately 8:45 p.m. that evening officials sought permission to search the moored vessel. After acknowledging that they did not have a search warrant and being refused permission to conduct a search, they broke into the vessel with an axe. Upon discovering a quantity of fish and the previously marked nets, the vessel and its contents were seized.

The Iosco Circuit Court issued condemnation and confiscation orders against the defendants. The Court of Appeals affirmed on May 2, 1974. 53 Mich App 192; 218 NW2d 813. On October 15, 1975, we granted leave to appeal. 392 Mich 809.

## II—Section 1b(2) not Unconstitutional Delegation

The threshold question in this case is whether § 1b(2) constitutes an unconstitutional delegation of legislative authority. Section 1b(2) provides:

"In addition to the requirements of this act and rules promulgated pursuant to this act, the license issued by the director of conservation may contain provisions:

(a) Fixing the amount of fish to be taken by species and kind.

(b) Designating the areas in which the licensee shall be permitted to fish.

(c) Specifying the season when and the depths where the licensee may conduct his commercial fishing operations.

(d) Specifying the methods and gear which the licensee shall use.

(e) Specifying other conditions, terms and restrictions which are deemed to be necessary in carrying out the provisions of this act, including but not limited to the

right to inspect the licensee's fishing operations in the waters, on board or ashore."

Defendants maintain that this provision marks a departure from the prior practice of the Legislature to maintain a commercial fishing law by modifying the original act (1929 PA 84) by detailed amendments[6] and since it provides no guidelines it must be regarded as an unconstitutional delegation of legislative authority.

The rule with regard to delegation was simply and aptly stated in the leading case of *Locke's Appeal,* 72 Pa 491, 498–499 (1873):

"The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government."

The difficulty, as this Court on a previous occasion suggested, "is in determining whether the limits [on the exercise of discretion conferred on the administrative official] are sufficiently defined to avoid delegation of legislative powers". *Argo Oil Corp v Atwood,* 274 Mich 47, 52; 264 NW 285 (1935).

In making this determination whether the statute contains sufficient limits or standards we must be mindful of the fact that such standards must be sufficiently broad to permit efficient administration in order to properly carry out the policy of the Legislature but not so broad as to leave the people

---

[6] Defendants suggest that an earlier departure from this practice came when the Legislature enacted 1959 PA 154 amending 1955 PA 218. MCLA 308.201 *et seq.;* MSA 13.1568(1) *et seq.* This act is not in issue in the present proceeding.

unprotected from uncontrolled, arbitrary power in the hands of administrative officials.

While no hard and fast rule exists for determining whether a given statute has provided sufficient standards, a number of guiding principles have evolved in Michigan jurisprudence to assist in making a determination in this case.

First, the act in question must be read as a whole; the provision in question should not be isolated but must be construed with reference to the entire act. *Argo Oil Corp v Atwood, supra,* 53.

Second, the standard should be "as reasonably precise as the subject matter requires or permits". *Osius v St Clair Shores,* 344 Mich 693, 698; 75 NW2d 25; 58 ALR2d 1079 (1956).[7]

The preciseness of the standard will vary with the complexity and/or the degree to which subject regulated will require constantly changing regulation.[8] The "various" and "varying" detail associated with managing the natural resources has led to recognition by the courts that it is impractical for the Legislature to provide specific regulations and that this function must be performed by the designated administrative officials. *People v Soule,* 238 Mich 130, 140; 213 NW 195 (1927). See *United States v Grimaud,* 220 US 506; 31 S Ct 480; 55 L Ed 563 (1910).

Third, if possible the statute must be construed in such a way as to "render it valid, not invalid", as conferring "administrative, not legislative" power and as vesting "discretionary, not arbitrary, authority". *Argo Oil Corp v Atwood, supra,* 53.

---

[7] A standard cannot be considered "as reasonably precise as the subject matter requires or permits" if it does not satisfy due process requirements. See decision in *State Highway Commission v Vanderkloot,* 392 Mich 159, 169–178; 220 NW2d 416 (1974).

[8] *See* 1 Am Jur 2d, Administrative Law, § 117, p 924; 1 Sutherland Statutory Construction (4th ed, Sands), § 4.16, p 102.

### III—APPLICATION OF PRINCIPLES

The first principle requires that the statute in question be viewed in its entirety. Section 1b(2) read together with 1b(1) provides a proper framework in which the Director of Natural Resources is authorized to act. Section 1b(1) provides:

"Notwithstanding the provisions of this or any other act, *the director of conservation, when in his opinion it is necessary for the better protection, preservation, management, harvesting and utilization of the fisheries in the waters* described in section 1 *may limit the number of fishing licenses to be issued under the provisions of this act and fix and determine the qualifications of such licensees.* In determining the number of licenses that the director of conservation issues during any license year, he shall take into consideration the number of persons holding such licenses, the number of licensees needed to harvest the fish known or believed to be harvestable, the capacity of the boats and equipment owned and used by licensees to effectuate such harvesting, and any other facts which may bear upon the allowing of a limited number of licensed persons to engage in commercial fishing in an economical and profitable manner. In determining the qualifications of the licensees, the director of conservation shall consider the kind, nature and condition of the boats and fishing equipment and gear to be used by the applicant, the years of experience the applicant has had in commercial fishing and the quantity and kinds of fish that the applicant has caught during the previous 5 years and such other facts which may assist him in determining that the applicant is capable to engage in commercial fishing in a proper and profitable manner and will comply with the laws applicable to commercial fishing." MCLA 308.1b; MSA 13.1491(2). (Emphasis added.)

The legislative policy and standards to guide the director are apparent, to wit: to protect and preserve the fisheries of this state and to allow the

taking of fish conditioned upon a grant of permission in the form of a license, but only when such taking will not disrupt the primary goal of protection and preservation. The director has been given the authority to factually determine the nature and degree of commercial fishing, in terms of species, location, and types of fishing gear, which may be allowed without affecting the goal of protection and preservation. These statutory provisions insure that the will of the Legislature will be given substance and effect as a result of the director's factual determinations.

Turning to the second principle, we conclude that the standard provided in the Commercial Fishing Law, while somewhat general, is "as reasonably precise as the subject matter requires or permits".

As suggested above, courts have recognized that the management of natural resources is a difficult and complex task. This is particularly true in the management of fisheries. In order to have proper management a measure of flexibility must be provided the director in dealing with numerous species of fish, their habits, their constantly changing environment, their response to interaction between species, their population growth and decline in various waters and the many other biological considerations involved.

It must be remembered that fish are recognized as the property of the state, *People v Soule, supra,* 139; *Aikens v Department of Conservation,* 387 Mich 495–502; 198 NW2d 304 (1974), and as such the Legislature could conceivably prohibit all commercial fishing activity. However, rather than adopt such an extreme course of action, the Legislature has provided for effective management by giving the director limited discretion, and not

arbitrary power, to regulate the commercial taking of fish.

In *People v Soule, supra,* this Court upheld similar enabling legislation relating to the Department of Conservation.[9] The crucial language of that act reads as follows:

"The commission of conservation of the department of conservation of this state shall, in accordance with the provisions of this act, have power to regulate the taking or killing of all fish, game and fur-bearing animals and game birds protected by the laws of this state, and may suspend or abridge the open season provided by law for the taking or killing of any such fish, animals or game birds in any designated waters or area of this state, *whenever in the opinion of said commission of conservation it becomes necessary to assist in the increased or better protection of such fish, game or fur-bearing animals or game birds, or of any particular kinds or species of the same, which may in the opinion of said commission be threatened from any cause or causes with depletion or extermination* in said waters or area, and for the purpose of such regulation, suspension, or abridgment, said commission of conservation is hereby empowered to make and promulgate any and all orders and regulations necessary to carry out the provisions of this act and as in this act provided, on the recommendation of the director of conservation after a thorough investigation has been made by him." (Emphasis added.)

Defendants seek to distinguish *Soule* on the basis that the authority conferred on the Conservation Commission was restricted to emergency situations where the species of wildlife in the words of the statute were "in danger of depletion or extermination". We do not find this distinction to be controlling. The state is not bound to wait until our natural resources are near extinction

[9] 1925 PA 230.

before it can properly authorize the Director of Natural Resources to act.

In upholding the constitutionality of § 1b(2) we are mindful as well of the third principle that if possible, the statute must be construed as valid. While we are sympathetic to the difficulties experienced by defendants and other commercial fishermen with the changing, and frequently limiting, of their operations by regulations, we cannot say that the act in question constitutes an unconstitutional delegation of authority.[10] Nor do we view § 1b(2) as permitting the Director of Natural Resources to act in an arbitrary and discriminatory fashion.

However, while we find that the Commercial Fishing Law has given the Director of Natural Resources reasonable discretion to act in accordance with legislatively provided guidelines, and not with power to act arbitrarily, we are mindful that authority, although properly delegated, may be subject to abuse. That is why the actual development of specific regulations by those charged with the task by the Legislature must be accompanied with due process protection. Such protection is necessary to minimize the opportunity for abuse of discretion as well as to adequately protect the interests of those affected by the regulations.

In those cases where authority is delegated to the administrative body, particularly where the subject matter dictates that the legislative standards provided are somewhat general, this Court would take a dim view of such delegation if adequate opportunity to intervene in the administrative rule-making procedure were not provided.

In this case it appears that the DNR provided

---

[10] During oral arguments some discussion was devoted to the relative merits of trap nets vis-a-vis gill nets and the soundness of DNR's management restrictions. The wisdom of the particular limitations placed on commercial licenses is not before us.

notice and hearings both in the development of general fishing regulations and for the defendants when they contested particular restrictions placed upon their licenses.[11]

## IV—RULE 3 DOES NOT EXCEED DNR's AUTHORITY

Defendants argue that while § 1b(2) authorizes the Director of the DNR to include restrictions on commercial fishing licenses, the section does not authorize the director to place restrictions which "further refine, limit, abridge, repeal or replace the restrictions enacted by the Legislature". DNR Order No. 17, Rule 3, which *inter alia* prohibits the use of gill nets with mesh sizes less than 8 inches in certain fishing zones and which served as the basis for the restrictions on defendants' license, was a limitation established by the DNR and not the Commercial Fishing Law. Consequently, defendants argue that the DNR has exceeded its authority granted by the statute.

Sections 1b(2) and 1b(1) must be read together. The language in 1b(1) that "[n]otwithstanding the provisions of this or any other act, the director of conservation, when in his opinion it is necessary for the better protection, management, harvesting and utilization of the fisheries * * * may limit the number of fishing licenses to be issued * * * and fix and determine the qualifications of such licensees" authorizes the director in issuing licenses under § 1b(2) to place reasonable restrictions on licenses not specifically spelled out in the act.

## V—ILLEGAL SEARCH AND SEIZURE

The final question before us is whether the

---

[11] See portion of supplemental brief filed by Ronald R. Tyler, counsel for plaintiff, in response to a request by Court made during oral arguments. (Appendix to this opinion.)

warrantless search constituted an unreasonable search in violation of the Fourth Amendment, and Article 1, § 11, of the Michigan Constitution. For the Court of Appeals it was enough that MCLA 300.12; MSA 13.1222 "specifically authorizes searches without a warrant if based upon probable cause". 53 Mich App 192, 199. However, a search without a warrant in order to be reasonable under the Fourth Amendment requires more than probable cause—exigent circumstances must also be present. *People v White,* 392 Mich 404; 221 NW2d 357 (1974).[12]

Although MCLA 300.12; MSA 13.1222 does not mention the requirement of exigent circumstances to justify warrantless searches, it is clear that this provision was enacted to cover those situations in which it is not feasible to obtain a warrant. We are "duty bound" under the Michigan Constitution to construe a statute in such a way as to uphold its validity. *People v Bricker,* 389 Mich 524, 528; 208 NW2d 172 (1973). Consequently, we construe MCLA 300.12; MSA 13.1222 as, *inter alia,* requiring the presence of exigent circumstances before conservation officers are authorized to conduct warrantless searches under the act.

In this case it does not appear that such exigent circumstances existed. DNR officials had the defendants under surveillance for more than a day prior to boarding the vessel and had established probable cause to believe that defendants were conducting illegal fishing operations well before the actual search took place. In addition, the

---

[12] Although the Court split in the result reached there was unanimous agreement that the validity of warrantless searches turned on the dual requirements of probable cause and exigent circumstances. Opinion of the Court at 410; dissenting opinion of Justices WILLIAMS and COLEMAN at 434. *See Coolidge v New Hampshire,* 403 US 443, 454–455; 91 S Ct 2022; 29 L Ed 2d 564 (1971).

vessel was moored at its berth and there was no
indication that the defendants were about to leave
to attempt to dispose of the incriminating evi-
dence. The facts suggest that the DNR officials had
ample time to obtain a valid search warrant. It
also should be noted that on a prior occasion
involving similar circumstances DNR officials *did*
obtain a valid warrant.[13]

Before this Court plaintiff no longer argues that
the actions of the conservation officers on the
evening of October 3rd constituted a valid search;
rather it contends that what took place was not a
search but a seizure.

Testimony given by George Robson, one of the
DNR officers involved in the October 3rd search
and seizure, is enlightening in this regard. Officer
Robson stated:

*"I advised them [Mrs. Seaman and another couple]
that I wanted to search the boat, and the deckhand
said, no, we weren't going to search it, and they asked
for a search warrant,* and I advised them we didn't
have one, and they indicated that we weren't going to
get on the boat without a search warrant.

* * *

*"Q. (Continued by Mr. Tyler [Prosecutor]):* * * * did
you speak with anyone with—regarding gaining access
to the boat?

*"A. Yes, I asked Mrs. Seaman for permission to
inspect the boat, and she said no.* She said, if you have
got a warrant you can get on the boat, and I advised

13 On May 11 between 10:30 and 11:00 a.m., conservation officers
observed defendants' fishing vessel in what they believed to be illegal
fishing operations. By 1 p.m. the same day they had obtained a search
warrant and conducted a search of the vessel at 2:30 p.m. This
amounted to a total of approximately 4 hours. With regard to the
October 3 search and seizure, over 24 hours passed from the time the
officers first observed the defendants' activity to the time the seizure
was made, and over 12 hours between the time the officers established
the presence in open water of illegal gill nets which belonged to the
defendants and the time of seizure.

her we didn't have a warrant but that we didn't need one, *we had probable cause to believe that a violation had been committed and probable cause to believe that the boat had been involved in the violation, and our intentions were to inspect the boat,* and she said no. Then, later she got on the boat, and she said, yeah, we can inspect the boat. They weren't going to unlock it, but we could inspect the boat, and Mr. Seaman also indicated that without a warrant we weren't going to search the boat, and then he finally consented to our searching the boat, but he wasn't going to unlock it.

"*Q.* So, what did you do then, if anything?

"*A.* Well, *we took an axe and broke the lock and went aboard the boat.*" (Emphasis added.)

There is little question that what took place, was—certainly in the minds of those involved—a search followed by a seizure and not simply a seizure as plaintiffs would have us believe.

With the search unconstitutional, the subsequent seizure of the vessel was illegal. When property has been wrongfully seized following an invalid search, the property should be returned to the owner. *People v Marxhausen,* 204 Mich 559–574; 171 NW 557; 3 ALR 1505 (1919); see *Amos v United States,* 255 US 313; 41 S Ct 266; 65 L Ed 654 (1921).

## CONCLUSION

Section 1b(2) of the Commercial Fishing Law does not constitute an unconstitutional delegation of legislative authority. Nor does Rule 3 of Order 17 exceed the authority granted the DNR by the Legislature.

The search of defendants' vessel was unconstitutional and, as a consequence, the subsequent seizure was illegal. Defendants are entitled to return of their fishing vessel.

The Court of Appeals is reversed in part and affirmed in part.

This matter is remanded to the Iosco Circuit Court for further proceedings not inconsistent with this opinion.

No costs.

COLEMAN and FITZGERALD, JJ., concurred with WILLIAMS, J.

LINDEMER and RYAN, JJ., took no part in the decision of this case.

APPENDIX

Portion of supplemental brief filed by Ronald R. Tyler, Attorney for Plaintiff-Appellee dated May 23, 1975:

I In response to the Supreme Court's inquiry as to what notices, if any, were given to Appellants of the changes in the commercial fishing regulations which occurred during the period of 1970 through 1972, the Department of Natural Resources submits the following facts:

1. As early as December 9, 1968 the Department of Natural Resources sent notices to all commercial fishermen advising them of the recent enactment of Act 335, PA 1968, which amended Section 1 of Act 84 of the Public Acts of 1929; MSA 13.1491(2) through 13.1491(5). In that notice all commercial fishermen were advised of forthcoming regulations of the commercial fishery under the new Act. (Exhibit #1)

2. On December 18, 1968 all licensed commercial fishermen in the Lake Huron area were given notice of a public hearing in compliance with Act 88, PA 1943, and Act 197, PA 1952,

(presently superseded by the Administrative Procedures Act, Act 306, 1969) regarding the inclusion of Lake Huron under the permit system of gill nets. On January 6, 1969 a public hearing on the matter set forth in the notice was conducted in the City of Alpena.

3. On June 23, 1969 the Department of Natural Resources gave notice to all commercial fishermen of a public hearing to be conducted at various places in the state regarding proposed administrative rules governing licensing eligibility of commercial fishermen. The public hearings were conducted on July 15, 1969.

4. On October 13, 1970 in compliance with the Administrative Procedures Act, Act 306, PA 1969, notice of hearing of proposed commercial fishing regulations under the zone management plan for the year 1971 was sent to all persons and organizations likely to be affected by the proposed rules, including the director of the Michigan Fish Producers Association. In addition the notice was sent to interested attorneys and was published by newspaper. On October 26 & 27 of 1970, public hearings were conducted in the cities of Saginaw, Alpena, Marquette, Grand Haven and Manistique. Appellants were present at the hearings in Saginaw. Minutes of the hearings were recorded and filed. Subsequently, the proposed rules were approved and promulgated pursuant to Section 45 and 46 of Act 306 of 1969 and published in the Michigan Administrative Code. The rules as promulgated were controlling as to the privileges granted appellants in their 1971 Commercial Fishing License.

5. On September 10, 1971 notice of public hear-

ing on proposed changes to the 1971 regulations on commercial fishing for the year 1971 [sic] was published and sent to all persons and organizations affected thereby in accordance with the Administrative Procedures Act. Public hearings on the proposed changes were conducted in the City of Manistique on September 21, 1971, Traverse City on September 22, 1971, and Bay City on September 23, 1971. Appellants were in attendance of the public hearing in Bay City. Minutes of the hearings were recorded and filed. Subsequently, the proposed rule changes were approved and promulgated pursuant to Section 45 and 46 of Act 306, PA 1969 and published in the Michigan Administrative Code effective March 18, 1972; being Order No. 17 (revised), amending rules R299.883, R299.886, R299.889 and R299.891. (Supplement No. 65 to the Code) The changes so promulgated were controlling as to the privileges granted appellants in their 1972 license.

II In response to the Supreme Court's inquiry as to whether the Department of Natural Resources provides administrative hearings for a licensee who contests the limitations of his license, it is submitted that the Department has followed and is continuing to follow the governing provisions of the Administrative Procedures Act, PA 306, 1969; MCLA 24.201 et seq.; MSA 3.560(101) et seq., regarding contested cases.

As applied to Appellants' case, McGahan and Seaman, through counsel, protested the restrictions and limitations of their 1972 commercial fishing license and requested an administrative hearing for the modification of license privileges

under the provisions of Act 306. Accordingly, Mc-
Gahan and Seaman were granted a formal admin-
istrative hearing which concluded September 12,
1972 before a hearing examiner. The Department
was represented by Curtiss G. Beck, Assistant
Attorney General and Appellants by Nino E.
Green, Esq., of Escanaba, MI.

Pending the Department's final decision as re-
quired by Section 85 of said Act, the conservation
officers seized Appellant's fishing vessel, the "Jerry
W," for violations alleged to have occurred October
2 & 3, 1972. (The events of which form the basis
for the present appeal.)

On October 26, 1972 the Department forwarded
the hearing examiners report and recommendation
to Appellants and informed them of the availabil-
ity of a further hearing before the Director of
Natural Resources in accordance with Section 81
of the Act.

On November 30, 1972 the Director of Natural
Resources in accordance with Section 85 of the
Act, gave his final decision based upon the hearing
examiner's recommendations and the record and
denied appellant's petition for expansion and mod-
ification of their commercial fishing privileges.

KAVANAGH, C. J. *(concurring).* I concur in the
judgment of my brother upholding the validity of
§ 1b(2) of the Commercial Fishing Law and rule 3
of DNR Order No. 17.

I also agree that the warrantless seizure of
defendants' vessel was unlawful.

Whether there was a search and seizure of the
vessel, or merely a seizure, makes no difference in
this case. The Fourth Amendment applies equally
to searches and to seizures. *United States v Mc-
Cormick,* 502 F2d 281 (CA 9, 1974).

The asserted existence of probable cause to believe this vessel was being used illegally does not serve to obviate the requirement of a warrant. "[N]o amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances'." *Coolidge v New Hampshire,* 403 US 443, 468; 91 S Ct 2022; 29 L Ed 2d 564 (1971). See also, *People v Beavers,* 393 Mich 554; 227 NW2d 511 (1975). As my brother points out, there were no exigent circumstances here.

The fact that MCLA 300.12; MSA 13.1222 purports to authorize seizures of this type without a warrant does not require a different result. A statute cannot justify an otherwise unconstitutional search. "Unless the statute itself falls within one of the exceptions to the warrant requirement, it must yield to the right to be secure against searches and seizures." *United States v McCormick, supra,* at 285.

Finally, the fact that this is a "civil" *in rem* proceeding does not take it out of the realm of the Fourth Amendment's protection. Indeed, *Boyd v United States,* 116 US 616; 6 S Ct 524; 29 L Ed 746 (1886), was a civil forfeiture proceeding. The Court in *Boyd* stated:

> "We are also clearly of the opinion that proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offences committed by him, though they may be civil in form, are in their nature criminal. * * * The information, though technically a civil proceeding, is in substance and effect a criminal one. * * * As, therefore, suits for penalties and forfeitures incurred by the commission of offences against the law, are of this quasi-criminal nature, we think that they are within the reason of criminal proceedings for all the purposes of the Fourth Amendment of the Constitution * * * ." 116 US 616, 633–634.

In *One 1958 Plymouth Sedan v Pennsylvania,*

380 US 693, 698; 85 S Ct 1246; 14 L Ed 2d 170
(1965), also a forfeiture proceeding, the Court rely-
ing on *Boyd,* held: "In both the *Boyd* situation and
here the essential question is whether evidence—
in *Boyd* the books and records, here the results of
the search of the car—the obtaining of which
violates the Fourth Amendment may be relied
upon to sustain a forfeiture. *Boyd* holds that it
may not."

The vessel must be returned to defendants.

Levin, J., concurred with Kavanagh, C. J.

Levin, J. *(concurring).*

I

I agree with the Court that the statute,[1] which
authorizes the director of conservation [Director of
Natural Resources] to "limit the number of fishing
licenses" and "determine the qualifications of such
licensees", does not constitute an unconstitutional
delegation of legislative authority and that the
Director of Natural Resources has been given "rea-
sonable discretion to act in accordance with legis-
latively provided guidelines".[2] I do not agree, how-
ever, that the statute must itself contain standards
to guide the exercise of the delegated authority.
See *People v Fields,* 391 Mich 206, 226; 216 NW2d
51 (1974) (Levin, J., dissenting).

I also concur in the Court's conclusion that the
fishing vessel seized pursuant to MCLA 300.12;
MSA 13.1222 must be returned because the offi-
cials who seized it did not have a warrant and

---

[1] MCLA 308.1b; MSA 13.1491(2).

[2] The quoted words—"reasonable discretion to act in accordance
with legislatively provided guidelines"—are from Justice Williams'
opinion.

there were no exigent circumstances which would justify the failure to obtain one.[3]

## II

Defendants were issued fishing licenses with a number of restrictions. They unsuccessfully challenged the restriction regulating the mesh size of the nets. They apparently continued to use their old nets which violated the license restriction; as required by statute, they reported their use of these nets to the Department of Natural Resources (DNR) each month.[4]

DNR officials claimed they observed defendants fishing with illegal nets. Shortly thereafter they seized the defendants' fishing vessel.

MCLA 300.14; MSA 13.1224 provides that when the property seized is of greater value than $300, the property shall be forfeited to the state upon a finding by the circuit court that it "was caught, killed, possessed, shipped or used contrary to law".

Regulation and licensing of vocational and avocational pursuits grows apace as the need to allocate the use of diminishing natural resources becomes more apparent. Effective enforcement of such licensing restrictions is in the public interest. Penal sanctions are a valid means of securing compliance. Nevertheless, if, for example, the motor vehicle code provided for mandatory forfeiture of an automobile for making an illegal left-hand turn or for a faulty muffler or a statute required forfeiture of a manufacturing plant for air or water pollution, a clear abuse of governmental authority would appear. On a proper record we

---

[3] I agree with the Chief Justice that the Fourth Amendment applies to seizures as well as searches.

[4] MCLA 308.20; MSA 13.1511.

should consider whether forfeiture of property for use in excess of authorization—in contrast with forfeiture for manufacture or transportation of contraband—is consistent with relevant constitutional principles.