PEOPLE v TURMON

Docket No. 55893. Submitted March 2, 1982, at Detroit.—Decided
    June 22, 1982. Leave to appeal applied for.

    Edward R. Turmon pled guilty to possession of a controlled
    substance, pentazocine, in the Recorder's Court of Detroit,
    George W. Crockett, III, J. Defendant was sentenced to two
    years probation. Defendant appeals alleging that the Legisla-
    ture unconstitutionally delegated the power to classify sub-
    stances as "controlled" to the State Board of Pharmacy and
    that his due process rights were violated since he was not
    afforded fair notice of the conduct proscribed. Held:

    1. The provisions of the controlled substances section of the
    Public Health Code permitting the State Board of Pharmacy to
    classify substances as "controlled" are an unconstitutional
    delegation of the Legislature's power to create criminal offen-
    ses.

    2. A prior holding of a panel of this Court which upheld this
    statutory scheme against a similar challenge was incorrectly
    decided.

    3. The Legislature may not grant the power to define crimi-
    nal offenses to an administrative agency or a group of none-
    lected bureaucrats.

    4. Since the duly elected representatives of the people have
    not chosen to define possession of pentazocine as a crime,
    defendant's conviction must be reversed.

    5. Due process is violated where the criminal nature of
    pentazocine is not enumerated in the Compiled Laws of Michi-
    gan but rather is contained in administrative regulations pro-
    mulgated by the Board of Pharmacy. The failure to re-enact

REFERENCES FOR POINTS IN HEADNOTES
[1, 5] 25 Am Jur 2d, Drugs, Narcotics, and Poisons § 7.
[2] 1 Am Jur 2d, Administrative law §§ 131-137.
[3] 16A Am Jur 2d, Constitutional Law § 818.
    25 Am Jur 2d, Drugs, Narcotics, and Poisons § 11.
[4] 16 Am Jur 2d, Constitutional Law § 41.
[6] 2 Am Jur 2d, Administrative Law § 287.

and publish at length such amendment of the Public Health Code also violates article 4, § 25 of Michigan's Constitution.

Reversed.

BEASLEY, J., dissented. He believes that the standards delineated by the controlled substances section of the Public Health Code are abundantly clear so as not to constitute an improper delegation of legislative power to the State Board of Pharmacy. He would also find that the publication of the Board of Pharmacy's classification of pentazocine as a controlled substance in the Michigan Administrative Code provided defendant with fair notice of the classification. He would affirm defendant's conviction.

OPINION OF THE COURT

1. ADMINISTRATIVE LAW — CONTROLLED SUBSTANCES — DELEGATION OF POWERS — BOARD OF PHARMACY.

The provisions of the controlled substances section of the Public Health Code which permit the State Board of Pharmacy to classify substances as controlled substances are an unconstitutional delegation of the Legislature's power to create criminal offenses (MCL 333.7201-333.7203, 333.7215; MSA 14.15[7201]-14.15[7203], 14.15[7215]).

2. ADMINISTRATIVE LAW — DELEGATION OF POWERS — CRIMINAL OFFENSES — ADMINISTRATIVE REGULATIONS — CONSTITUTIONAL LAW.

The Legislature may not grant the power to define criminal offenses to an administrative agency, however, the Legislature may delegate power to an administrative agency to create administrative regulations in the civil arena (Const 1963, art 4, § 1).

3. CONSTITUTIONAL LAW — CRIMINAL LAW — DUE PROCESS — CONTROLLED SUBSTANCES — ADMINISTRATIVE REGULATIONS — NOTICE.

A defendant's due process rights are violated since he is not afforded fair notice of the conduct proscribed where the defendant is convicted of the possession of a controlled substance which is not listed as a controlled substance in the Compiled Laws of Michigan but rather is listed in an administrative regulation promulgated by the State Board of Pharmacy under statutory provisions permitting the board to classify substances as controlled substances (US Const, Am XIV).

4. CONSTITUTIONAL LAW — AMENDMENT OF ACTS.

Michigan's Constitution requires that a section or sections of an

act which is altered or amended shall be re-enacted and published at length (Const 1963, art 4, § 25).

DISSENT BY BEASLEY, J.

5. ADMINISTRATIVE LAW — CONTROLLED SUBSTANCES — DELEGATION
    OF POWERS — BOARD OF PHARMACY.
    *The provisions of the controlled substances section of the Public Health Code which permit the State Board of Pharmacy to classify substances as controlled substances are abundantly clear and are not an unconstitutional delegation of the Legislature's power to create criminal offenses (MCL 333.7201-333.7203, 333.7215; MSA 14.15[7201-14.15[7203], 14.15[7215]).*

6. CONSTITUTIONAL LAW — CRIMINAL LAW — FAIR NOTICE — CONTROLLED SUBSTANCES — BOARD OF PHARMACY — ADMINISTRATIVE CODE.
    *A defendant is not denied fair notice that a substance has been classified as a controlled substance where such classification is made by the State Board of Pharmacy under provisions of the controlled substances section of the Public Health Code which permit the board to classify substances as controlled substances and where such classification is published in the Michigan Administrative Code.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Principal Attorney, Appeals, and *Janice M. Joyce,* Assistant Prosecuting Attorney, for the people.

*Sheila N. Robertson,* Assistant State Appellate Defender, for defendant on appeal.

Before: R. M. MAHER, P.J., and BEASLEY and P. J. MARUTIAK,* JJ.

R. M. MAHER, P.J. Defendant pled guilty to possession of a controlled substance, pentazocine, in violation of MCL 333.7403(2)(b); MSA 14.15(7403)(2)(b), and was sentenced to two years probation. He appeals as of right.

_____

* Circuit judge, sitting on the Court of Appeals by assignment.

Defendant contends that his conviction must be reversed inasmuch as the Legislature has never declared that possession of pentazocine is a crime. However, pursuant to a legislative grant of authority, the State Board of Pharmacy has classified pentazocine as a controlled substance.

MCL 333.7215; MSA 14.15(7215) provides:

"The administrator shall place a substance in schedule 3 if it finds all of the following:

"(a) The substance has a potential for abuse less than the substances listed in schedules 1 and 2.

"(b) The substance has currently accepted medical use in treatment in the United States.

"(c) Abuse of the substance may lead to moderate or low physical dependence or high psychological dependence."

In 1979, in accordance with the above procedure, the State Board of Pharmacy classified pentazocine as a schedule 3 controlled substance. The board's action found expression in the following regulation:

"R 338.3120. Schedule 3; stimulants; depressants; nalorphine.

"Rule 20. * * *

"(2) Unless specifically excepted or unless listed in another schedule, a material, compound, mixture, or preparation that contains any quantity of the following substances having a depressant effect on the central nervous system, including its salts, isomers (whether optical, position, or geometric), and the salts of such isomers, whenever the existence of such salts, isomers, and the salts of isomers is possible within the specific chemical designation, is included in schedule 3:

"(a) Chlorhexadol
      Glutethimide
      Lysergic acid
      Lysergic acid amide

Methyprylon
Pentazocine
Sulfondiethylmethane
Sulfonethylmethane
Sulfonmethane"
1979 AC, R 338.3120(2).

In *People v Uriel,* 76 Mich App 102; 255 NW2d 788 (1977), a panel of this Court upheld this statutory scheme against a similar challenge. We are convinced, however, that *Uriel* was incorrectly decided. We believe that the provisions of the controlled substances section of the Public Health Code permitting the State Board of Pharmacy to classify substances as "controlled" amount to an unconstitutional delegation of the Legislature's power to create criminal offenses.[1]

We find the following scenario repugnant to traditional concepts of democracy: A group of non-elected bureaucrats gets together and makes an essentially unreviewable determination that possession of certain substances should be a crime. Thousands of formerly law-abiding citizens of this state are instantly reclassified as dangerous, contemptible criminals, subject to incarceration for extensive periods of time in the state penitentiary and to all the horrors modern prison life entails: brutality, deprivation, and rape.

We do not address at this time the power of the Legislature to determine that mere possession of certain substances poses a serious enough threat to our society to justify depriving a person of his liberty. This Court must not, however, permit the Legislature to abdicate its solemn responsibility to the citizens of this state by delegating such authority to a mere administrative agency.

[1] MCL 333.7201-333.7203, 333.7215; MSA 14.15(7201)-14.15(7203), 14.15(7215).

The *Uriel* Court stated that "[t]he majority of jurisdictions which have considered this issue have upheld the statutory scheme", *id.,* 108, and cited a number of cases in support of this proposition.[2] We initially observe that the three cases principally relied upon by the *Uriel* Court include decisions by two intermediate appellate courts and one by a trial court.[3] On the other hand, our research reveals that the highest courts of at least five states have correctly found such attempted delegation of legislative power unconstitutional. See *Howell v State,* 300 So 2d 774 (Miss, 1974), *State v Gallion,* 572 P2d 683 (Utah, 1977), *Sundberg v State,* 234 Ga 482; 216 SE2d 332 (1975), *State v Rodriguez,* 379 So 2d 1084 (La, 1980), and *State v Johnson,* 84 SD 556; 173 NW2d 894 (1970). Thus, it is far from clear, as the *Uriel* Court stated, that its holding represented the majority position; indeed, *Uriel* may be just as easily said to reflect a backward, minority view.

Const 1963, art 4, § 1 provides that "[t]he legislative power of the State of Michigan is vested in a senate and a house of representatives". It may be conceded that the Legislature may delegate power to an administrative agency to create administrative regulations in the civil arena. The creation of crimes, however, is a peculiarly legislative prerogative. Under the Michigan Constitution, the Legis-

---

[2] "See *People v Einhorn,* 75 Misc 2d 183; 346 NYS2d 986 (Sup Ct, 1973), *State v Lisk,* 21 NC App 474; 204 SE2d 868 (1974), *lv den* 285 NC 666; 207 SE2d 759 (1974), *Cassell v State,* 55 Ala App 502; 317 So 2d 348 (Crim App, 1975). See also *White v United States,* 395 F2d 5 (CA 1, 1968), *cert den* 393 US 928; 89 S Ct 260; 21 L Ed 2d 266 (1968), *Iske v United States,* 396 F2d 28 (CA 10, 1968), *State v Sargent,* 252 Or 579; 449 P2d 845 (1969), *State v Boyajian,* 344 A2d 410 (Me, 1975). *Contra, Howell v State,* 300 So 2d 774 (Miss, 1974), *Sundberg v State,* 234 Ga 482; 216 SE2d 332 (1975)." *Uriel, supra,* 108, fn 3.

[3] The *Uriel* panel, however, also cited two federal circuit court opinions and opinions by the highest courts of two states which summarily disposed of this issue.

lature may not grant the power to define criminal offenses to an administrative agency.

The Michigan Supreme Court has never sanctioned the creation of crimes by an administrative agency. According to *People v Hanrahan,* 75 Mich 611, 619; 42 NW 1124 (1889):

"To declare what shall constitute a crime, and how it shall be punished, is an exercise of the sovereign power of a state, and is inherent in the legislative department of the government."

In *Senate of Happy Home Clubs of America v Board of Supervisors of Alpena County,* 99 Mich 117, 120; 57 NW 1101 (1894), the Supreme Court struck down a disorderly persons statute allowing those accused of drunkenness to be acquitted upon compliance with the rules and regulations of private corporations operating detoxification centers. The Court held:

"This, in effect, permits unofficial persons to prescribe rules which shall acquit persons charged with crime. * * * It is not within the province of the Legislature to delegate to private corporations the power to make laws for the discharge of offenders."

If a nonelected group of bureaucrats may not create regulations permitting particular criminal offenders to go free, surely such a group may not create laws providing for the incarceration of otherwise innocent people.

As we have already noted, a number of state courts have refused to sanction similar statutory schemes. In *Rodriguez, supra,* 1085, the Supreme Court of Louisiana held:

"It is well settled in Louisiana jurisprudence that the

determination and definition of acts which are punishable as crimes are purely legislative functions. * * * Another equally well established rule is that the legislative power to create and define offenses cannot be delegated." (Footnote and citations omitted.)

In *Gallion, supra,* 688-690, the Supreme Court of Utah stated:

" 'The power of the legislature to repeal or amend the penalty to be imposed for crime is not a matter of judicial concern. It is part of the sovereign power of the state, and it is the exclusive right of the legislature to change or amend it; * * *.'

"Thus this court has recognized there are certain *essential legislative functions* which cannot be transferred to others.

*      *      *

"There are sound reasons for ruling the definition of a crime and the precise punishment therefor to be essential legislative functions, which cannot be transferred. Criminal trials would be unduly complicated, for the defendant would have the right to challenge the administrative procedure and the findings where a substance has been scheduled or rescheduled. A similar determination by the legislature could not be challenged. The administrative rulings are not statutes and are not incorporated into the code, a person who wishes to abide by the law would have to resort to the permanent register kept by the secretary of state to determine the status of a substance.

"There is a certain peril involved if administrative procedures can be applied to the criminal law. Why couldn't an administrator revise the penalties in Section 76-6-412, according to the consumer price index or a determination that there had been an excessive amount of theft of property valued at less than $100. A determination of the elements of a crime and the appropriate punishment therefor are, under our Constitutional system, judgments, which must be made exclusively by the legislature." (Footnote omitted; emphasis in original.)

Finally, in *Howell, supra,* 779-781, the Supreme Court of Mississippi stated:

"It is readily apparent that when the State Board of Health shifted amphetamines from Schedule III to Schedule II, the maximum penalty for possession thereof increased. The practical effect of moving a substance from one schedule and placing it in another is to increase or diminish the criminal penalty for violation of the act. It is likewise true that, if substances are added to or deleted from any of the schedules such action makes acts pertaining to the substances so added a crime, and as to substances deleted, abolishes a crime. The result is that the State Board of Health is given the authority to define a crime, and ordain its punishment.

"The exclusive authority of the legislature to define crimes and fix the punishment therefor is without question.

\* \* \*

"We hold that the authority to define crimes and fix the punishment therefor is vested exclusively in the legislature, and it may not delegate that power either expressly or by implication, but must exercise it under Article 4, Section 33 of the Constitution. We further hold that the attempted delegation of power to the State Board of Health is contrary to Article 1, Sections 1 and 2 of the Constitution providing for separation of the powers of the government of the state into three departments. The State Board of Health is an administrative agency and as such is a part of the executive department of the state. When it rescheduled amphetamines from Schedule III to Schedule II, it increased the punishment of Howell in excess of that fixed by the legislature and thereby exercised legislative power. This infringes on the separation of the powers of government and is prohibited."

The dissenting opinion quotes a magazine article in support of the proposition that pentazocine is a drug of a "perilous nature". Be that as it may, the

nature of pentazocine is relevant only insofar as it may provide a rational basis for the *Legislature* to proscribe it.

When the Legislature passes a criminal law, it does so with the recognition that it will be held responsible for its action at the polls. One of the most fundamental tenets of democracy is that the people have the right to vote for those who are invested with the solemn responsibility to decide what conduct poses a serious enough threat to our society to justify depriving a person of his freedom. The Legislature may not avoid this responsibility to the citizens of this state by delegating the power to create criminal offenses to a group of nonelected bureaucrats.

Since the people of the State of Michigan, speaking through their duly elected representatives, have not chosen to define possession of pentazocine as a crime, defendant's conviction of this offense must be reversed.

Defendant also contends that application of the Board of Pharmacy's purported amendment of the controlled substances section of the Public Health Code to defendant would violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution since he was not afforded fair notice of the conduct proscribed. We agree.

As our accumulation of statutes has become more and more prodigious, it has become increasingly difficult for an individual to mold his or her conduct to the requirements of the law. It may be conceded for the sake of argument that one has "fair notice" of every statute printed in the official Compiled Laws of Michigan. However, even if one manages to read and memorize every single word of the compiled laws, one will still be blissfully

unaware of the fact that possession of pentazocine is supposed to be a crime. In order to discover the criminal nature of pentazocine, one must wade through a morass of administrative regulations.

We experienced considerable difficulty locating the Board of Pharmacy's purported amendment of the controlled substances section of the Public Health Code. The compiled laws contain no cross-reference to this administrative regulation. We find the notion that our citizens must read the publications of the Board of Pharmacy in order to find out whether or not they are criminals repugnant to our concept of due process of law.

We also observe that the Board of Pharmacy's purported amendment of the controlled substances section of the Public Health Code was not re-enacted and published at length, as is required by Const 1963, art 4, § 25.

Reversed.

P. J. MARUTIAK, J., concurred.

BEASLEY, J. *(dissenting)*. I respectfully dissent. On September 18, 1980, defendant, Edward R. Turmon, pled guilty to possession of a controlled substance, pentazocine, in violation of MCL 333.7403(2)(b); MSA 14.15(7403)(2)(b). After being sentenced to two years probation and $200 court costs, he appeals as of right.

Defendant was originally charged in a two-count information with possession with intent to deliver phenmetrazine and possession with intent to deliver pentazocine. As a consequence of a plea-bargain agreement, the prosecutor dismissed the original charges in exchange for defendant's guilty plea to the lesser offense of possession of pentazocine.

On appeal, defendant claims that his conviction

must be reversed because the Legislature did not criminalize the possession of pentazocine. Rather, the drug was classified as a controlled substance by the State Board of Pharmacy, which was delegated legislative power by a statutory enactment. Alternatively, defendant contends that, even if the Legislature properly delegated power to the pharmacy board, he was not sufficiently apprised of the criminal nature of his act.

Pentazocine, more commonly known by the brand name Talwin, is a potent analgesic which is equivalent in analgesic effect to codeine.[1] Although not originally classified as a controlled substance in schedule 3 of the controlled substance section of the Public Health Code,[2] pentazocine was added as a schedule 3 controlled substance by the State Board of Pharmacy pursuant to MCL 333.7215; MSA 14.15(7215), which provides:

"The administrator shall place a substance in schedule 3 if it finds all of the following:

"(a) The substance has a potential for abuse less than the substances listed in schedules 1 and 2.

"(b) The substance has currently accepted medical use in treatment in the United States.

"(c) Abuse of the substance may lead to moderate or low physical dependence or high psychological dependence."

The Michigan Board of Pharmacy is the administrator referred to in the foregoing statute.[3] This board designated pentazocine as a schedule 3 depressant in 1979 in the following regulation:[4]

[1] Physicians' Desk Reference (36th ed), p 2036 (1982).

[2] MCL 333.7216; MSA 14.15(7216).

[3] MCL 333.7103(2); MSA 14.15(7103)(2).

[4] 1979 AC, R 338.3120(2).

"Rule 20. * * *

"(2) Unless specifically excepted or unless listed in another schedule, a material, compound, mixture, or preparation that contains any quantity of the following substances having a depressant effect on the central nervous system, including its salts, isomers (whether optical, position, or geometric), and the salts of such isomers, whenever the existence of such salts, isomers, and the salts of isomers is possible within the specific chemical designation, is included in schedule 3:

"(a) Chlorhexadol
Glutethimide
Lysergic acid
Lysergic acid amide
Methyprylon
Pentazocine
Sulfondiethylmethane
Sulfonethylmethane
Sulfonmethane"

The State Board of Pharmacy is authorized to supplement, delete, or reschedule substances by MCL 333.7202; MSA 14.15(7202), which provides the following guidelines:

"In making a determination regarding a substance, the administrator shall consider all of the following:

"(a) The actual or relative potential for abuse.

"(b) The scientific evidence of its pharmacological effect, if known.

"(c) The state of current scientific knowledge regarding the substance.

"(d) The history and current pattern of abuse.

"(e) The scope, duration, and significance of abuse.

"(f) The risk to the public health.

"(g) The potential of the substance to produce psychic or physiological dependence liability.

"(h) Whether the substance is an immediate precursor of a substance already controlled under this article."

Defendant claims that the Legislature may not

lawfully delegate to the State Board of Pharmacy
the power to add proscribed substances, as this
constitutes an unlawful delegation of legislative
power to an administrative agency.

In *People v Uriel*,[5] where defendants were
charged with delivery of the controlled substance
of methaqualone, we upheld the statutory scheme
which empowers the State Board of Pharmacy to
supplement, delete, or reschedule substances. The
*Uriel* Court stated:[6]

"We apply *Seaman [Dep't of Natural Resources v
Seaman,* 396 Mich 299; 240 NW2d 206 (1976)] to the
present case. Reading the Controlled Substances Act as
a whole, we find the standards provided to the Board of
Pharmacy 'as reasonably precise as the subject matter
requires or permits'. The act contains five schedules
listing various controlled substances and provides the
board with specific grounds for listing a substance in a
particular schedule. For example, if the board finds that
a substance has (a) a high potential for abuse, and (b)
has no accepted medical use in treatment in the United
States or lacks safety for use in treatment under medi-
cal supervision, the board is required to place that
substance in schedule 1. MCL 335.313; MSA 18.1070(13)
[now MCL 333.7211; MSA 14.15(7211)]. MCL 338.1102;
MSA 14.757(2) [now MCL 333.17721; MSA 14.15(17721)]
provides that the Board of Pharmacy shall consist of
seven members, six of which shall be registered phar-
macists licensed in the state for at least five years,
actively engaged in the practice of pharmacy and grad-
uates of a recognized college of pharmacy and the
seventh shall be a representative of the general public.
Further, MCL 335.311(5); MSA 18.1070(11)(5) [now MCL
333.7206(1); MSA 14.15(7206)(1)] of the act establishes 'a
6-member scientific advisory commission to serve as a
consultative and advising body to the administrator in
all matters relating to the classification, reclassification,
addition to or deletion from, of all substances presently

---

[5] 76 Mich App 102; 255 NW2d 788 (1977).

[6] *Id.,* 106-107.

classified as controlled substances in schedules 1 to 5, or
substances not presently controlled or yet to come into
being. The scientific advisory commission shall be made
up of 2 physicians to be appointed by the director of the
department of health; 2 pharmacists to be appointed by
the director of the department of licensing and regula-
tion; the chief of the crime detection laboratory of the
department of public health, and the director of the
department of state police or his designee.' "

A recent article in the official magazine of the
United States Food and Drug Administration dis-
cussed the perilous nature of Talwin, the brand
name of pentazocine:[7]

"Talwin mixed with an antihistamine, Pyribenza-
mine, and injected can produce a 'rush' or 'high' as
good or better than heroin. Pyribenzamine is sold as a
blue tablet, hence the street name, T's and Blues. As
street supplies of heroin have become scarce, expensive,
and of poor quality, addicts have turned. to T's and
Blues as a cheap and readily available substitute. Eu-
phoria isn't all they are getting for their money, how-
ever. Overdoses of Talwin can cause psychotic effects
and may result in convulsions, coma, and possibly
death. * * *

"Coupled with this evidence was the unfolding story
of the abuse of T's and Blues. A DEA pharmacist,
appearing before FDA's Controlled Substances Advisory
Committee in March 1978, reported on a case in Chi-
cago which clearly established pentazocine as a drug of
abuse. City investigators audited records of a local
wholesaler and found that 18 pentazocine orders were
filled for one pharmacy in a 3-month period. A check of
the pharmacist's records found a discrepancy of approx-
imately 1.5 million pentazocine and Pyribenzamine tab-
lets between the amount ordered and the amount used
to fill legitimate prescriptions. This represents $5 mil-
lion at the price addicts were paying on the street. A
diversion of this size is possible with uncontrolled

[7] Hecht, *The Saga of T's and Blues,* FDA Consumer (March, 1979).

drugs, according to DEA, because they are not subject to audits and inventory controls and investigators cannot see sales records except with a court order. Chicago authorities were able to build a case because they suspected a problem existed."

This article is a further indication why the State Board of Pharmacy decided to classify pentazocine as a controlled substance. I would adhere to the ruling in *Uriel* and hold that the standards delineated by the controlled substances section of the Public Health Code are abundantly clear so as not to constitute an improper delegation of legislative power to the State Board of Pharmacy.

Defendant also contends that he was denied adequate notice that the drug was proscribed. The pharmacy board's classification of pentazocine as a controlled substance is printed in the 1979 Michigan Administrative Code, page 2608, and first appeared in the code's quarterly supplement number 99, page 92, published August 14, 1979. I would find that defendant was not denied fair notice of pentazocine's classification as a class 3 depressant and would vote to affirm.