AUTOMOTIVE SERVICE COUNCILS OF MICHIGAN v
SECRETARY OF STATE

Docket No. 31100. Submitted October 12, 1977, at Lansing.—Decided
    April 17, 1978. Leave to appeal applied for.

    In 1974 the Legislature enacted the Motor Vehicle Service and
    Repair Act. The Secretary of State was named the administra-
    tor of the act. Automotive Service Councils of Michigan
    brought a complaint against the Secretary of State, seeking to
    enjoin the Secretary from enforcing the act and a declaration
    that the act, or portions of the act, and rules promulgated
    pursuant to the act, are unconstitutional. An amended com-
    plaint was filed, adding Ramsay Collision, Inc., as a party
    plaintiff. Upon motion for summary judgment by defendant,
    the Ingham County Circuit Court, James T. Kallman, J., de-
    clared unconstitutional as an impermissible commingling of
    powers those portions of the act allowing the administrator to
    make rules, investigate alleged violations, prosecute, adjudicate
    and impose sanctions, declared the rule-making power of the
    administrator to be an unconstitutional delegation of legislative
    power, and found one portion of the act void for vagueness.
    Partial summary judgment was granted to the plaintiffs and
    the defendant was enjoined from implementing or enforcing
    those portions held unconstitutional. Partial summary judg-
    ment was granted to the defendant as to those portions of the
    act not declared unconstitutional. The Secretary of State ap-
    peals, and the plaintiffs cross-appeal. *Held:*

        1. The combination of the several powers in the Secretary of
    State does not render the act unconstitutional; such combina-

REFERENCES FOR POINTS IN HEADNOTES
[1] 5 Am Jur 2d, Appeal and Error § 841.
[2, 4, 5, 11, 12] 7 Am Jur 2d, Automobiles and Highway Traffic §§ 12,
    16.
[3–5] 1 Am Jur 2d, Administrative Law §§ 110–112, 126, 127.
    2 Am Jur 2d, Administrative Law § 297.
[6–9] 73 Am Jur 2d, Statutes §§ 37, 42, 103, 123.
[9] 73 Am Jur 2d Statutes § 282.
[10] 73 Am Jur 2d, Statutes §§ 265, 306.

tion of powers in an administrative agency does not necessarily violate due process, and there was no showing of any actual risk of bias.

2. The delegation to the administrator of the power to make rules defining "unfair and deceptive practices" is not an unconstitutional delegation of unbridled authority or arbitrary discretion to declare practices unfair and deceptive; a reading of the act as a whole demonstrates that the statutory provisions are precise and detailed and provide definitive guidelines for the formulation of rules and a standard for the exercise of the administrator's power.

3. A portion of the act which uses the words "cost" and "actual cost" following previous references to "price" and "estimated price" is not impermissibly vague because in common usage the words "cost" and "price" are used interchangeably, and the change in terms may be explained by the difference in point of view between the time when a repair is contemplated and the time when it is completed.

Reversed.

H. L. HEADING, J., dissented from that portion of the majority's opinion holding that the legislative scheme which permits the administrator to make rules, investigate, prosecute, adjudicate and impose sanctions is constitutional. Judge HEADING would adopt the reasoning of the trial judge and hold that the scheme violates due process of law and is therefore unconstitutional.

### OPINION OF THE COURT

1. APPEAL AND ERROR—CONSTITUTIONAL LAW—LEGISLATION—QUESTIONS OF LAW.

The Court of Appeals does not pass upon the wisdom of legislation; its function on appeal of a decision finding legislation unconstitutional is confined to reviewing the questions of law presented by the trial judge's findings.

2. CONSTITUTIONAL LAW—DUE PROCESS—STATUTES—MOTOR VEHICLE SERVICE AND REPAIR ACT—COMBINATION OF POWERS.

The Motor Vehicle Service and Repair Act is not rendered unconstitutional by reason of its combination in the Secretary of State, as administrator of the act, of the powers to make rules, investigate alleged violations of the act, prosecute, adjudicate, and impose sanctions for violations of the act; such combination of powers does not necessarily violate due process where there was no showing of actual risk of bias.

3. STATUTES—RULE-MAKING POWER—DELEGATION OF POWER—STAN-
DARDS—PRINCIPLES FOR INQUIRY.

Inquiry into the validity of a statutory delegation of rule-making
power, and a determination of whether a statute contains a
sufficient standard to guide the rule-maker's decisions, is gov-
erned by the following principles: (1) the act in question must
be read as a whole, (2) the standard should be as reasonably
precise as the subject matter requires or permits, and (3) if
possible, the statute must be construed in such a way as to
render it valid, not invalid, as conferring administrative, not
legislative, power and as vesting discretionary, not arbitrary,
authority.

4. CONSTITUTIONAL LAW—STATUTES—MOTOR VEHICLE SERVICE AND
REPAIR ACT—RULE-MAKING POWER—DELEGATION OF POWER.

A section of the Motor Vehicle Service and Repair Act which
directs the Secretary of State to make rules defining unfair and
deceptive practices does not unconstitutionally delegate unbri-
dled authority or arbitrary discretion to declare practices un-
fair and deceptive; actions prohibited by the act and noncompli-
ance with the mandates of the act constitute unfair and decep-
tive practices susceptible to more extensive definition by rule,
and the statutory provisions are precise and detailed, providing
definitive guidelines for the formulation of rules (MCLA
257.1309; MSA 9.1720[9]).

5. CONSTITUTIONAL LAW—STATUTES—MOTOR VEHICLE SERVICE AND
REPAIR ACT—RULE-MAKING POWER—DELEGATION OF POWER.

The Motor Vehicle Service and Repair Act provides a standard
for the exercise of the rule-making power of the administrator
of the act: practices prohibited by rule must be "unfair or
deceptive"; when the act is read as a whole, the "unfair or
deceptive practices" standard is sufficiently definite to uphold
as constitutional the act's delegation of rule-making power to
the administrator (MCLA 257.1309; MSA 9.1720[9]).

6. CONSTITUTIONAL LAW—STATUTES—INTERPRETATION OF STATUTES—
PRESUMPTION OF CONSTITUTIONALITY—SUSTAINING LEGISLATION.

Statutes are presumed to be constitutionally valid, and if more
than one construction of a statute is permissible, that which
sustains the legislation should be adopted.

7. CONSTITUTIONAL LAW—STATUTES—INTERPRETATION OF STATUTES—
SUSTAINING LEGISLATION—CONSTITUTIONAL VALIDITY.

Courts should strive to sustain the validity of a statute if it can
be done without doing violence to the language of the act, and

whenever possible an interpretation that does not create constitutional invalidity is preferred to one that does.

8. CONSTITUTIONAL LAW—STATUTES—INTERPRETATION OF STATUTES—PRESUMPTION OF CONSTITUTIONALITY.

The presumption of constitutionality of a statute may justify a construction of the statute that is rather against a natural interpretation of the language used if necessary to sustain the statute.

9. STATES—LEGISLATURES—STATUTES—INTERPRETATION OF STATUTES—TAKING PRIVATE PROPERTY—INTENTION OF LEGISLATURE.

Courts prefer to impute to the Legislature an absence of intention to take private property without just compensation on the assumption that the Legislature would not designedly commit an act of injustice.

10. STATUTES—INTERPRETATION OF STATUTES—ABSURD RESULTS—WORDS AND PHRASES—ORDINARY MEANING.

A statutory interpretation that leads to an absurd result should be avoided, and in construing a statute the words used are given their ordinary meaning.

11. STATUTES—MOTOR VEHICLE SERVICE AND REPAIR ACT—INTERPRETATION OF STATUTES—WORDS AND PHRASES—COST—PRICE.

A section of the Motor Vehicle Service and Repair Act which refers to "cost" and "actual cost" of repairs, following references to "price" or "estimated price", is not void for vagueness because the words "cost" and "price" are commonly used interchangeably, and the change in terms may be explained by the difference in point of view between the time when a repair is contemplated and the time when the repair is completed (MCLA 257.1332[1]; MSA 9.1720[32][1]).

CONCURRENCE IN PART, DISSENT IN PART BY H. L. HEADING, J.

12. CONSTITUTIONAL LAW—DUE PROCESS—STATUTES—MOTOR VEHICLE SERVICE AND REPAIR ACT—COMMINGLING OF POWERS.

*The legislative scheme of the Motor Vehicle Service and Repair Act wherein the Secretary of State, as administrator of the act, is allowed to make rules, investigate, prosecute, adjudicate and impose sanctions for violations of the act is such a commingling of powers as to constitute a violation of due process of law, and should therefore be declared unconstitutional.*

*Sigal & Seeligson,* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Frederick H. Hoffecker* and *Edwin M. Bladen,* Assistants Attorney General, for defendant.

Before: Danhof, C. J., and Allen and H. L. Heading,* JJ.

Danhof, C. J. The parties appeal by right from the circuit court's summary judgment for plaintiffs holding unconstitutional several provisions of 1974 PA 300 as amended by 1976 PA 12, codified as MCLA 257.1301 *et seq.;* MSA 9.1720(1) *et seq.,* and commonly known as the Motor Vehicle Service and Repair Act. The circuit judge permanently enjoined the Secretary of State from implementing or enforcing the provisions held unconstitutional, but held that they were severable from the remainder of the act and that the secretary was entitled to enforce "all sections not declared unconstitutional".

The parties have devoted substantial portions of their briefs to arguments concerning the wisdom of the legislation before us for consideration. We do not pass upon the wisdom of legislative judgments, precisely because it is to the Legislature that the power, duty, and heavy responsibility of making such judgments is entrusted. Const 1963, art 4, § 1. Our function is confined to reviewing the questions of law presented by the trial judge's findings of unconstitutionality.

"The primary determination of public need and character of remedy in the exercise of the police power is in the legislature. Unless the remedy is palpably unreasonable and arbitrary so as needlessly to invade prop-

---

* Detroit Recorder's Court judge, sitting on the Court of Appeals by assignment.

erty or personal rights as protected by the Constitution, the act must be sustained. The presumption favors validity and, if the relation between the statute and the public welfare is debatable, the legislative judgment must be accepted." *Carolene Products Co v Thomson,* 276 Mich 172, 178; 267 NW 608 (1936).

Bearing these principles in mind, we proceed to consideration of the provisions of the act held unconstitutional by the trial judge.

## I

Plaintiffs maintained, and the trial judge agreed, that the legislative scheme allowing the administrator[1] to make rules,[2] investigate alleged violations,[3] prosecute, adjudicate, and impose sanctions[4]

---

[1] MCLA 257.1308; MSA 9.1720(8), provides:

"The secretary of state or his designee shall administer this act. A person designated by the secretary of state to act in his place shall not be affiliated with a motor vehicle repair facility."

[2] MCLA 257.1309(i); MSA 9.1720(9)(i), provides that the administrator shall:

"Promulgate rules pursuant to Act No. 306 of the Public Acts of 1969, as amended, being sections 24.201 to 24.315 of the Michigan Compiled Laws.

"The rules shall include but not be limited to:

"(i) Definitions of unfair and deceptive practices.

"(ii) Definitions of minor repair services.

"(iii) Criteria for determining the competency of specialty and master mechanics, as a prerequisite to continued certification under this act.

"(iv) Definition of repair categories for the certification of specialty and master mechanics.

"(v) Other rules as are necessary to implement this act."

[3] MCLA 257.1326; MSA 9.1720(26), provides:

"(1) The administrator shall on his own initiative or in response to complaints, make reasonable and necessary public or private investigations within or outside of this state and gather evidence against a person who violated or is about to violate this act or a rule or order hereunder.

"(2) The administrator may:

"(a) Require or permit a person to file a statement in writing or otherwise as the administrator determines as to all the facts and circumstances concerning the matter to be investigated.

"(b) Mediate disputes between parties arising from violations of this act or an administrative rule.

"(c) Develop conditions of probation or operation for the facility or mechanic mutually agreed upon and signed by the facility or the mechanic and the administrator instead of further disciplinary proceedings.

"(d) On his own inititive, conduct spot check investigations of motor vehicle repair facilities registered or required to be registered throughout the state on a continuous basis to determine whether or not the facility is in compliance with this act and rules promulgated hereunder. The administrator may not alter the odometer on a vehicle employed in such investigations or deliberately misrepresent the condition of the vehicle.

"(e) Conduct mechanical and diagnostic examinations of vehicles when there are reasonable grounds to believe that an unlawful act or practice was used to produce the repair or to make the repair."

Under MCLA 257.1317; MSA 9.1720(17), "The registered facility or one required to be registered under this act shall be open to inspection by the administrator during reasonable business hours. A person who hinders, obstructs, or otherwise prevents an inspection is in violation of this act." The act also requires that a repair facility "shall maintain such reasonable records as are required by rules promulgated to carry out this act. The records shall be open for reasonable inspection by the administrator or other law enforcement officials as specified by rule." MCLA 257.1318; MSA 9.1720(18).

4 MCLA 257.1321(1); MSA 9.1720(21)(1), provides:

"If the administrator determines after notice and a hearing that a person has violated this act or a rule promulgated pursuant to it, or engaged in an unfair or deceptive method, act, or practice, directly or through an agent or employee, he may issue an order requiring the person to cease and desist from the unlawful act or practice or to take such affirmative action as in the judgment of the administrator will carry out the purposes of this act."

Further, upon making "a finding of fact in writing that the public interest will be irreparably harmed by delay in issuing an order" the administrator may issue a temporary cease and desist order prior to holding a hearing on the alleged violation. MCLA 257.1321(2); MSA 9.1720(21)(2). In addition, the act empowers the administrator to "deny, suspend, or revoke a registration, certificate, or mechanic trainee permit after notice and opportunity for a hearing where the administrator determines that the facility, mechanic, or trainee" engaged in one of eleven specified categories of prohibited conduct.

The act also provides an alternate, concurrent, enforcement procedure:

"If it appears that a person has engaged, is engaging, or is about to engage in a method, act, or practice in violation of this act or the rules promulgated hereunder, the attorney general or county prosecutor, may after receiving notice of an alleged violation of this act, with or without prior administrative proceedings having occurred, bring an action in the name of the people of this state to enjoin that method, act, or practice." MCLA 257.1323; MSA 9.1720(23).

Upon receipt of notice of an alleged violation of the act, the

results in such a commingling of powers as to constitute a deprivation of due process under the Michigan Constitution. The trial judge concluded:

"As administrator the Secretary has the authority to investigate repair facilities. If it appears that there is a violation of the rules or statute the Secretary may prosecute and sit in judgment. The Secretary argues that due process is the embodiment of fair play. It is difficult to see how there can be fair play when a person has made a decision as to what is right or wrong (rule) and then the same person or one in the same department sits in judgment of one accused of violating that rule. Under such a system there is likely to be some bias, and unquestionably the appearance of bias on the part of the person sitting in judgment."

Accordingly, the trial judge held that the combination of functions in the administrator violated due process of law, relying on *Crampton v Department of State*, 395 Mich 347; 235 NW2d 352 (1975). There is no gainsaying the trial judge's conclusion that the act endows the administrator with comprehensive power to investigate, prosecute, adjudicate, and impose sanctions for violations of the act or rules promulgated thereunder, as is apparent from the statutory provisions set out in the margin. We disagree, however, with the trial judge's interpretation of the Supreme Court's decision in *Crampton, supra.*

Attorney General or prosecuting attorney "shall immediately forward written notice of the alleged violation" to the administrator. MCLA 257.1324; MSA 9.1720(24).

The act also contemplates informal resolution of disputes between parties contesting a violation of the act by means of a "voluntary assurance" by the motor vehicle repair facility that the facility will discontinue the alleged violation. MCLA 257.1327; MSA 9.1720(27). Such assurances may include provisions for refund, affirmative action by the facility to correct alleged violations, or for the deposit in escrow of money for restitution to an aggrieved consumer pending the outcome of an action pursuant to the act.

Evidently the trial judge viewed *Crampton* as an instance of the differing treatment accorded by Federal and state courts to questions involving allegedly unconstitutional combinations of functions, noting that "State courts are more likely to give closer scrutiny on review to the combination of inconsistent functions". See 2 Davis, Administrative Law, § 13.02, p 181 (1958). Be that as it may, it is also true that "the case law, both federal and state, generally rejects the idea that the combination with judging of prosecuting or investigating functions is a denial of due process * * * ". Davis, *supra,* § 13.02, p 175, *Withrow v Larkin,* 421 US 35, 52; 95 S Ct 1456, 1467; 43 L Ed 2d 712, 726 (1975).

In *Crampton* the Supreme Court at 351, adopting the analysis of the United States Supreme Court in *Withrow v Larkin, supra,* at 47; 95 S Ct at 1464; 43 L Ed 2d at 723, identified four situations[5] in which " 'experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable' ". Here, as in *Crampton, supra,* at 355–356, our examination focuses on the last category of situations, in which the judge or decision maker "might have prejudged the case because of prior participation as an accuser, investigator, fact finder or initial decisionmaker". In *Crampton,* plaintiff had been arrested by a member of the Lansing Police Department and convicted of driv-

---

[5] "Among the situations identified by the Court as presenting that risk are where the judge or decisionmaker

(1) has a pecuniary interest in the outcome;

(2) 'has been the target of personal abuse or criticism from the party before him';

(3) is 'enmeshed in [other] matters involving petitioner * * * '; or

(4) might have prejudged the case because of prior participation as an accuser, investigator, fact finder or initial decisionmaker." *Crampton, supra,* at 351 (footnotes omitted).

ing under the influence of intoxicating liquor, MCLA 257.625; MSA 9.2325, and, because he refused to consent to a chemical test to determine the alcohol content of his blood, he was subjected to the license revocation ,procedures provided in such cases under the implied consent law. MCLA 257.625d, e, and f; MSA 9.2325(4), (5), and (6). Under the law as it existed prior to the decision in *Crampton,* the license appeal board that entertained Crampton's appeal from revocation of his driver's license included a police officer from the local police department involved in the initial arrest and prosecution. The only questions in the appeal proceedings were

"whether his fellow police officer had (1) reasonable grounds to believe Crampton was driving while under the influence of intoxicating liquor, (2) placed him under arrest while he was in that condition, (3) advised him of his rights, and (4) requested that he submit to a chemical test and, if so, whether he reasonably refused to submit to a test." *Crampton, supra,* at 356–357. (Footnotes omitted.)

Noting that "resolution of those factual issues will often turn on appraisal of the credibility of the opposing testimony of the officer and the citizen", the Court concluded that

"The risk that they [police officers and prosecuting attorneys] will be unable to step out of their roles as full-time law enforcement officials and into the role of unbiased decisionmaker in a law enforcement dispute between a citizen and a police officer presents a probability of unfairness too high to be constitutionally tolerable." *Crampton, supra,* at 357–358. (Footnotes omitted.)

For several reasons, the holding in *Crampton* does not dictate a conclusion that the act under

consideration is unconstitutional. In contrast with
the statutorily defined composition of the appeal
board in *Crampton,* the Motor Vehicle Service and
Repair Act does not mandate hearings before a
"full-time law enforcement official" whose func-
tions include not only administrative adjudication
of the dispute arising under the act but also the
instigation or prosecution, in separate *criminal*
proceedings, of the same statutory violations. This
conclusion derives in part from the fact that the
Supreme Court gave no indication in *Crampton*
that it found objectionable the inclusion of the
Secretary of State or his representative on the
appeal board, and in part from the fact that in
*Wolney v Secretary of State,* 77 Mich App 61; 257
NW2d 754 (1977), this Court upheld the legislative
response to *Crampton.*

After the decision in *Crampton* the appeal board
was replaced by a hearing officer appointed by the
Secretary of State[6] and the circuit court agreed
with *Wolney's* contention that "when the Legisla-
ture amended the statute by making the sole
member of the hearing panel a hearing officer
appointed by the Secretary of State, it continued a
procedure which was defective on the same due
process grounds as the predecessor statute". *Wol-
ney, supra,* at 66. On appeal, the *Wolney* panel
observed:

"[T]he Secretary of State is not such a [full time] law
enforcement officer even though the Secretary of State
is given certain enforcement powers.

"In addition, the responsibilities of the Secretary of
State in *Crampton* were delegated to an employee of
the Secretary of State and in the present case the
statute provides for the appointment of a hearing offi-

---

[6] 1976 PA 9, see MCLA 257.625f; MSA 9.2325(6), MCLA 257.322;
MSA 9.2022.

cer; in neither case has the Secretary of State given full time law enforcement personnel the duty of evaluating the credibility of other such personnel. Therefore the holding of *Crampton* in regard to full time law enforcement officers is not controlling in this case." *Wolney, supra,* at 67.

We recognize that the administrator's functions under this act are more comprehensive than those remitted to him under the implied consent law, since here he has investigatory and rule-making powers in addition to his adjudicative function. *Cf. Wolney, supra,* at 69. Nevertheless, we are persuaded, absent any indication in *Crampton* that the Supreme Court intended to impose, as a matter of Michigan constitutional law, due process limitations more stringent than those applicable under the Federal Constitution, that the combination of these several powers in the Secretary of State does not render the act unconstitutional. We are guided by the holding of the United States Supreme Court in *Withrow v Larkin, supra,* on which the Court relied in *Crampton* in applying the "probability of unfairness" standard enunciated in *Withrow.* In *Withrow* the Court said:

"Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'" 421 US at 47; 95 S Ct at 1464; 43 L Ed 2d at 723.

The Court concluded, however:

"The contention that the combination of investigative and adjudicative functions *necessarily* creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome *a presumption of honesty and integrity in those serving as adjudicators;* and it must

convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of *actual bias or prejudgment* that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Withrow v Larkin, supra,* 421 US at 47; 95 S Ct at 1464; 43 L Ed 2d at 723–724. (Emphasis added.)

The same language from *Withrow* was quoted approvingly by the Court in *In the Matter of Del Rio,* 400 Mich 665, 690–691; 256 NW2d 727 (1977), in which the Court rejected respondent's contention that the combination of investigative and adjudicative roles in the Judicial Tenure Commission created an "inherent" risk of bias or prejudgment. In so holding, the Court stated that "the authority is legion in support of the proposition that combining the investigative and adjudicative roles in a single agency does not necessarily violate due process in administrative adjudications", and also observed that, as here, respondent had failed to document his charge by any showing of *actual* risk of bias. 400 Mich at 690–691. The Court also noted that GCR 1963, 932.10 specifically requires the appointment of an independent master to preside over the adjudicative process, a factor quite similar to that cited by the Court in *Withrow:*

"Within the Federal Government itself, Congress has addressed the issue in several different ways, providing for varying degrees of separation from complete separation of functions to virtually none at all. For the generality of agencies, Congress has been content with § 5 of the Administrative Procedure Act, 5 USC § 554(d) [5 USCS § 554(d)], which provides that no employee engaged in investigating or prosecuting may also participate or advise in the adjudicating function * * * ."

*Withrow v Larkin, supra,* at 51–52; 95 S Ct at 1467; 43 L Ed 2d at 726.

Our own Administrative Procedure Act, MCLA 24.282; MSA 3.560(182), provides in pertinent part:

"Unless required for disposition of an ex parte matter authorized by law, a member or employee of an agency assigned to make a decision or to make findings of fact and conclusions of law in a contested case shall not communicate, directly or indirectly, in connection with any issue of fact, with any person or party, nor, in connection with any issue of law, with any party or his representative, except on notice and opportunity for all parties to participate. This prohibition begins at the time of the notice of hearing. An agency member may communicate with other members of the agency and may have the aid and advice of the agency staff *other than the staff which has been or is engaged in investigating or prosecuting functions in connection with the case under consideration or a factually related case.*" (Emphasis added.)

Further, the APA provides a procedure whereby a party who has reason to believe that the adjudicating officer's impartiality has been tainted can move for his disqualification to preside in the proceeding.[7]

We think it significant that in *Del Rio, supra,* the Court did not cite or discuss its decision in

---

[7] MCLA 24.279; MSA 3.560(179):

"An agency, 1 or more members of the agency, a person designated by statute or 1 or more hearing officers designated and authorized by the agency to handle contested cases, shall be presiding officers in contested cases. Hearings shall be conducted in an impartial manner. On the filing in good faith by a party of a timely and sufficient affidavit of personal bias or disqualification of a presiding officer, the agency shall determine the matter as a part of the record in the case, and its determination shall be subject to judicial review at the conclusion of the proceeding. When a presiding officer is disqualified or it is impracticable for him to continue the hearing, another presiding officer may be assigned to continue with the case unless it is shown that substantial prejudice to the party will result therefrom."

*Crampton,* which offers inferential support for our narrow construction of the holding in that case. We agree with the *Wolney* panel that "Examination of the principal case upon which *Crampton* relies shows that the rule in *Crampton* should not be expanded further". *Wolney, supra,* at 68.

Finally we do not believe that the added factor of the administrator's rule-making power should alter the result. "An administrative agency may have administrative or executive, investigatory, legislative, or judicial powers or all or a combination of these." 1 Am Jur 2d, Administrative Law, § 77, p 872.

"Some administrative agencies investigate violations of law and act as accusers as well as determine violations of their own regulations, or act as advocates or prosecutor as well as judge in the same proceeding.

"The danger of unfairness is particularly great in an agency in which there is a high degree of concentration of both prosecuting and judicial functions, especially where the functions are combined in the same men. The courts have pointed out that in such situations the agency members must be zealous in the recognition and preservation of the right to a hearing by impartial triers of the facts, and such fusion of functions has been subjected to considerable criticism. However, the combination of functions has never been held to violate constitutional right or deny due process of law." *Id.* § 78, p 873.

In *Hoffmann-LaRoche, Inc v Kleindienst,* 478 F2d 1, 13 (CA 3, 1973), which involved an administrative proceeding that culminated in the issuance of an order of general application, the Court said:

"The fact that Hoffmann may be one of those adversely affected explains the highly adversary character of the proceeding but does not change the generalized nature of the order. Although the proceeding involved a

concrete factual situation from which factual inferences
provided the basis for the Director's order, the facts and
inferences therefrom were used to formulate *a basically
legislative-type judgment of entirely prospective appli-
cation. Since the proceedings were thus in substance
rule making, the separation of prosecuting and decision-
making functions was not required."* (Emphasis added.)
(Citations omitted.)

In the present case the administrator has al-
ready promulgated rules having only prospective
application, see 1976 AACS R 257.101 *et seq.,* and
we see no due process objection to their future
enforcement in the proceedings provided under the
act in light of the provisions of the Administrative
Procedures Act designed to ensure that such pro-
ceedings are fair and impartial. As the Supreme
Court observed in *Attorney General ex rel Rich v
Jochim,* 99 Mich 358, 371; 58 NW 611 (1894):

"Due process is not necessarily judicial process. Ad-
ministrative process, which has been regarded as neces-
sary in government, and sanctioned by long usage, is as
much due process as any other."

Accordingly, for the foregoing reasons, we reverse
the judgment of the trial court holding unconstitu-
tional the act's commingling of investigative, pro-
secutorial, rule-making and adjudicative functions
in the administrator.

## II

Section 9 of the act provides:

"The administrator shall * * * promulgate rules pur-
suant to Act No. 306 of the Public Acts of 1969, as
amended, being sections 24.201 to 24.315 of the Michi-
gan Compiled Laws.

"The rules shall include but not be limited to:

"(i) Definitions of unfair and deceptive practices." MCLA 257.1309(i); MSA 9.1720(9)(i).[8]

Plaintiffs contended, and the circuit judge agreed,[9] that the act contained no standard to guide the administrator in exercising his rule-making power and that therefore this section constituted an unconstitutional delegation of legislative power to the administrator.

Here, as in *Argo Oil Corp v Atwood,* 274 Mich 47, 52; 264 NW 285 (1935), "The attack is upon the statute itself, not upon the discretion exercised by the secretary of State thereunder if the law be valid". The principles governing our inquiry into the validity of a statutory delegation to the administrator of rule-making power were summarized recently in *Department of Natural Resources v Seaman,* 396 Mich 299, 308–309; 240 NW2d 206 (1976):

"In making this determination whether the statute contains sufficient limits or standards we must be mind-

---

[8] The rules promulgated pursuant to this authority appear at 1976 AASC R 257.131–257.137, and include provisions concerning contract and invoice terms, repair and parts replacement, warranties, advertising and representations, estimates and charges, and coercive practices.

[9] The trial judge stated in his opinion:

"It is true that unfair and deceptive practices may be too numerous for the legislature to enumerate. This is evidenced by the four pages of definitions of unfair and deceptive practices contained in the rules as promulgated by the Secretary. However, there remains a question of whether there is an adequate standard to guide the Secretary in defining unfair and deceptive practices.

"The title of the Act indicates that its purpose is 'to proscribe unfair and deceptive practices.' Little else is stated except that the Secretary may promulgate rules in this area. While a legislative intent may be gleened from a reading of the entire statute, the cases clearly indicate that there must be a reasonably precise standard. Such a standard is lacking here. The Court is of the opinion that there has been an unconstitutional delegation of legislative authority to the Secretary."

ful of the fact that such standards must be sufficiently broad to permit efficient administration in order to properly carry out the policy of the Legislature but not so broad as to leave the people unprotected from uncontrolled, arbitrary power in the hands of administrative officials.

"While no hard and fast rule exists for determining whether a given statute has provided sufficient standards, a number of guiding principles have evolved in Michigan jurisprudence to assist in making a determination in this case.

"First, the act in question must be read as a whole; the provision in question should not be isolated but must be construed with reference to the entire act. *Argo Oil Corp v Atwood, supra,* 53.

"Second, the standard should be 'as reasonably precise as the subject matter requires or permits'. *Osius v St Clair Shores,* 344 Mich 693, 698; 75 NW2d 25; 58 ALR2d 1079 (1956).[7]

"The preciseness of the standard will vary with the complexity and/or the degree to which subject regulated will require constantly changing regulation.[8] * * * .

"Third, if possible the statute must be construed in such a way as to 'render it valid, not invalid', as conferring 'administrative, not legislative' power and as vesting 'discretionary, not arbitrary, authority'. *Argo Oil Corp v Atwood, supra,* 53.

---

"[7] A standard cannot be considered 'as reasonably precise as the subject matter requires or permits' if it does not satisfy due process requirements. See decision in *State Highway Commission v Vanderkloot,* 392 Mich 159, 169–178; 220 NW2d 416 (1974).

"[8] *See* 1 Am Jur 2d, Administrative Law, § 117, p 924; 1 Sutherland Statutory Construction (4th ed, Sands), § 4.16, p 102."

Reading the act before us as a whole, it is apparent, as the trial judge himself observed, that a "legislative intent may be gleaned from a reading of the entire statute". Focusing only on those sections that relate to "unfair and deceptive practices," we find that the act gives content to that

standard. Section 32[10] of the act requires the repair
facility to provide a written, itemized estimate of
the price for labor and parts necessary for a
specific job before commencing work, prohibits
charges in excess of the estimated price without
first obtaining the written or oral consent of the

---

[10] "Sec. 32. (1) A motor vehicle repair facility shall give to the
customer a written estimate, itemizing as closely as possible the price
for labor and parts necessary for a specific job prior to the commence-
ment of work. A facility shall not charge for work done or parts
supplied in excess of the estimated price or in excess of the limit
stated by the customer in the waiver provided for in subsection (3)
without the knowing written or oral consent of the customer which
shall be obtained at some time after it is determined that the
estimated price or stated limit is insufficient and before any work not
estimated or in excess of the limit is done or the parts not estimated
or in excess of the limit are supplied. If a waiver is not signed as
provided in subsection (3) and the estimated price is exceeded by not
more than 10% or $10.00 whichever is lesser, the written or oral
consent of the customer for the excess charge need not be obtained
unless specifically requested by the customer. This section shall not be
construed as requiring a motor vehicle repair facility, mechanic, or
mechanic trainee to give a written estimated price if he agrees not to
perform the requested repair. If the actual cost of repair is less than
the agreed upon estimated cost, the customer shall pay only the
actual cost.

"(2) If the facility or mechanic informs the customer that the price
for repair will exceed the written estimate or the stated limit in the
waiver and the customer does not want the repair work performed
then the customer is liable for all reasonable costs to return the
vehicle to the condition it was when it entered the facility. These
costs should be indicated in written form itemizing the costs as closely
as possible with a copy given to the customer. The cost of a diagnosis
to be made, whether or not the customer authorizes repairs to be
performed, shall be contained in the written estimate before the
diagnosis is undertaken.

"(3) If a customer initiates a request for service or parts for the
repair of a motor vehicle without receiving a written estimate and
voluntarily agrees to pay all reasonable costs of repair up to an
amount stated by the customer, a repair facility may obtain from the
customer a waiver of his right to receive a prior estimate of repair
costs. The waiver shall be in 14 point or larger bold capital type face
and executed with 1 copy to the customer requesting the repairs
* * * ."

After specifying the form of such waivers, the section provides:

"This waiver shall not be effective unless given by the customer
voluntarily and with full knowledge of the implications of the waiver.
A motor vehicle repair facility or anyone in its employ shall not make
use of the waiver in an attempt to evade this act." MCLA 257.1332;
MSA 9.1720(32).

customer, renders the customer liable for the cost of returning the vehicle to its former condition if the customer refuses authorization for repairs in excess of the estimate that are subsequently determined to be necessary by the repair facility, and requires the repair facility to itemize such costs in writing. Section 32 also requires that the cost of diagnosis shall be contained in the written estimate provided before the diagnosis is undertaken. The obvious purpose of these provisions is to permit the consumer to enter into a transaction involving the repair of a sophisticated machine with reasonably precise awareness of the cost of such services, if he or she so desires, and to prevent unilateral imposition upon the consumer by the repair facility of additional costs in excess of the estimated cost without prior notice to and consent by the consumer. The section protects the repair facility by making the consumer liable for the cost of returning the vehicle to its former condition if permission to perform additional needed repairs is refused, and also provides, alternatively, that the consumer may waive the above rights by agreeing to "pay all reasonable costs of repair up to an amount stated". Waivers must be given "voluntarily and with full knowledge of the implications of the waiver", and waivers may not be used to evade the act.

To ensure that these provisions are effectuated, the administrator has promulgated rules defining unfair and deceptive practices that prohibit contracts that use a waiver to circumvent or evade the act, and contracts that take "advantage of a customer's inability to reasonably protect his interests on account of illiteracy or inability to understand the language of an agreement, if the facility knows or reasonably should know of the customer's inability". 1976 AACS R 257.131(1)(a)

and (b). The act prohibits misrepresentations by the repair facility,[11] and the rules promulgated by the administrator detail the meaning of this prohibition by enumerating the situations in which specific types of misrepresentations will be deemed unfair and deceptive practices.[12] Similarly, rules have been promulgated defining as unfair and deceptive practices various types of non-compliance with § 34 of the act,[13] which requires written

[11] "Sec. 35. A resident agent, director, officer, or partner of a motor vehicle repair facility who knowingly authorizes, directs or makes a false statement or misrepresentation concerning the method or price of repair of a motor vehicle, or who knowingly fails to comply with the terms of a final cease and desist order is subject to penalties under this act. Each violation constitutes a separate offense."

[12] The rules define as unfair and deceptive, "A contract which has gross discrepancies between the oral representations of the facility and the written agreement covering the same transaction", and provide that

"(2) It is an unfair and deceptive practice to:

"(a) Make, either written or orally, an untrue or misleading statement of a material fact.

(b) Fail to reveal a material fact, the omission of which tends to mislead or deceive the customer and which fact could not reasonably be known by the customer.

* * *

(d) Allow a customer to sign an acknowledgement, certificate, or other writing which affirms acceptance, delivery, compliance with a requirement of law, or other performance, if the facility knows or has reason to know that the statement is not true." 1976 AACS R 257.131(1)(c), and (2)(a)(b) and (d).

Other rules detailing various types of misrepresentations as unfair and deceptive practices in connection with other provisions of the act include 1976 AACS R 257.132(c) and (f), 1976 AACS R 257.134 (Advertising and representations), and 1976 AACS R 257.137.

[13] MCLA 257.1334; MSA 9.1720(34), which provides:

"Sec. 34. A motor vehicle repair facility, including a gasoline service station which performs any of the repairs listed in the repair categories of certification for specialty mechanics or developed by the administrator by rule, shall give to each customer a written statement upon return of the repaired vehicle to the customer. The statement shall disclose:

"(a) Repairs needed, as determined by the facility.

(b) Repairs requested by the customer.

(c) Repairs authorized by the customer.

(d) The facility's estimate of repair costs.

(e) The actual cost of repairs.

statements of repairs and charges to be provided
upon return of the vehicle to the customer, and
§ 33 of the act[14] granting customers the right to
return of replaced parts upon completion of re-
pairs, and requiring that customers be informed of
that right.

It is apparent from the foregoing, which is by no
means intended as an exhaustive or exclusive
exposition of the sections of the act (and the rules
promulgated pursuant to them) that give meaning
and precise content to the term "unfair and decep-
tive practice", that § 9 does not delegate to the
administrator unbridled authority or arbitrary dis-
cretion to declare practices unfair and deceptive.
Rather, actions prohibited by the act, and noncom-
pliance with the mandates of the act, constitute
unfair and deceptive practices susceptible to more
extensive definition by rule. The statutory provi-
sions are precise and detailed, and provide defini-
tive guidelines for the formulation of rules expli-
cating fully the meaning of the statutory man-
dates and prohibitions.

(f) The repairs or services performed, including a detailed identifica-
tion of all parts that were replaced and a specification as to which are
new, used, rebuilt, or reconditioned.

(g) A certification that the repairs were completed properly or a
detailed explanation of an inability to complete repairs properly. The
statement shall be signed by the owner of the facility or by a person
designated by the owner to represent the facility. The name of the
mechanic or mechanics who performed the diagnosis and the repair
shall also appear on the statement."

Rules defining various types of noncompliance with § 34 of the act
as unfair and deceptive practices include 1976 AACS R 257.131(2)(j)(i)
through (vii), 1976 AACS R 257.132(a), (e), (f), and (h), and 1976 AACS
R 257.136 (estimates and charges).

[14] MCLA 257.1333; MSA 9.1720(33). 1976 AACS R 257.136(d) pro-
vides that "It is an unfair and deceptive practice to: * * * Fail to
inform a customer, at a time prior to the customer executing a
document or engaging the facility for the work, by the use of a notice
as required by section 33 of the act, of his right to receive or inspect
replaced parts for which he will be charged in the repair of his motor
vehicle."

The complexity of modern motor vehicles and the rapid advance of automotive technology make it difficult, in some cases, to diagnose mechanical problems, estimate the cost of repairs, perform the repairs, determine whether the repairs have been properly performed, and decide whether a given repair is necessary or worthwhile. Given these complexities, we are satisfied that the standard provided by § 7's prohibition against engaging or attempting to engage in "a method, act, or practice which is unfair or deceptive," MCLA 257.1307; MSA 9.1720(7), and § 9's delegation to the administrator of authority to define unfair and deceptive practices, is "as reasonably precise as the subject matter requires or permits". See *Department of Natural Resources v Seaman, supra,* at 309. Read as a whole, the act prohibits unfair and deceptive practices defined in the sections of the act alluded to above. The Legislature's use of the phrase "unfair and deceptive practices" as a standard to guide the administrator in the exercise of his rule-making power thus delegates that power in terms sufficiently flexible to adapt the rules promulgated pursuant to the act to changing technology and business practices, but at the same time the administrator's discretion is limited by the parameters of the act as a whole.

Although we recognize that the strictures imposed upon the business practices of reputable repair facilities by the act and the rules promulgated pursuant thereto may produce burdensome results in some cases, we are also mindful of the gross abuses practiced by a segment of the repair industry, which the Legislature sought to remedy by this act, and of our duty to construe the statutory response to the problem so as to " 'render it valid, not invalid,' as conferring 'administrative,

not legislative' power and as vesting 'discretionary, not arbitrary, authority' ". *Department of Natural Resources v Seaman, supra,* at 309. In *Ranke v Corporation & Securities Commission,* 317 Mich 304, 307; 26 NW2d 898 (1947), the Court upheld a statute authorizing the commission to suspend or revoke real estate broker licenses for *"Any other conduct whether of the same or a different character than hereinbefore specified,* which constitutes *dishonest or unfair dealing".* (Emphasis added.) The Court said:

"The limitation, placed upon the commission by the act, is that the conduct complained of must constitute dishonest or unfair dealing. *The act provides a standard by which the commission shall be guided in the making of rules.* It would be quite impossible for the legislature to enumerate all the specific acts which would constitute dishonest or unfair dealing upon the part of those engaged in the sale of real estate. The act authorizes the commission to enumerate additional grounds of dishonest or unfair dealing and to make rules in harmony with the subject matter legislated upon." 317 Mich at 309–310 (emphasis added).

Although the Legislature could conceivably have provided more elaborate standards for the exercise of the administrator's power, it is clear that there is a standard; practices prohibited by rule must be "unfair or deceptive". This case is thus unlike *Osius v St Clair Shores,* 344 Mich 693; 75 NW2d 25 (1956), in which the Court found that there were no standards to control exercise of the board's discretion. Reading the act as a whole, the "unfair or deceptive practices" standard provided by the act is sufficiently definite to render constitutional the Legislature's delegation of rule-making

power to the administrator,[15] and accordingly the trial court is reversed.

## III

In *People v Wilde,* 42 Mich App 514; 202 NW2d 542 (1972), defendant, with the assistance of a "cooperative" insurance adjuster, inflated his estimate of the cost of repairing an automobile more than $400 over the actual cost of the repairs and was convicted of obtaining money under false pretenses.[16] This Court reversed the conviction because, since the insurance company knew that defendant's estimate contained misrepresentations, the element of reliance by the victim was absent. The Court said:

"As offensive as cases involving people being duped by gross misrepresentations of value may be, the Legislature has failed to make such chicanery a crime." 42 Mich App at 518.

In § 32(1) of the act before us, quoted in full at n 10, *ante,* the Legislature has attempted to curb such abuses by providing that "If the actual cost of repair is less than the agreed upon estimated cost, the customer shall pay only the actual cost".

Plaintiffs argued, and again the trial judge agreed, that this sentence of the act is void for

---

[15] Plaintiffs' reliance on *McKibbin v Corporation & Securities Commission,* 369 Mich 69; 119 NW2d 557 (1963), is misplaced. Although that case involved the same statute upheld in *Ranke,* the question was whether the anti-discrimination rule adopted by the commission was within the scope of its legislatively delegated power. 369 Mich at 78, 81. *McKibbin* involved a challenge of a rule promulgated pursuant to the statute, whereas *Ranke* involved a challenge of the statute itself. Compare *Argo Oil Corp v Atwood, supra,* at 52.

[16] The inflated estimate included a kickback for the adjuster and a charge for repairing non-existent damage, as well as a paint job for the entire car included to induce the owner of the car to go along with the scheme.

vagueness. The interpretations advanced by the parties and considered by the trial court are well summarized in the trial judge's opinion,[17] and will not be considered further. Our own view of the

---

[17] The trial judge reasoned as follows:

"Section 32, the section providing for estimates, is the target of the vagueness attack. As mentioned earlier that section provides that the facility shall give the customer a written estimate of the *price* for labor and parts for a specific job. It also provides that 'if the actual cost of repair is less than the agreed upon estimated cost, the customer shall pay only the actual cost.' What meaning should be given to this statement?

"It would appear that the 'estimated cost' refers to the written price estimate that must be given to the customer. The term 'actual cost of repair' on its face would appear to mean the cost to the garageman for completing the repair. Therefore, the statement in question would mean that if the cost to the garageman to complete the repair is less than the estimated price then the customer pays only what it cost the garageman to complete the repair. The Defendant argues that such an interpretation would be absurd. The Plaintiff argues that such an interpretation would be a taking without due process in violation of the Fourteenth Amendment because it denies the garageman his profit.

"What then is the correct interpretation? The Defendant asserts that the term 'cost' refers to the amount of money a customer will actually pay the facility for a given repair. Under the Defendant's view, the actual cost of repair would be the amount the customer actually pays. Therefore, the statement in question would read: If the amount of money the customer actually pays is less than the agreed on estimated cost the customer shall pay only the amount the customer actually pays. Aside from making very little sense the statement provides no definitive guideline as to how the actual cost of repair is to be measured. While the Defendant seems to have no problem with the term 'actual cost of repair' the garageman would be at a loss as to what the term means and how it is to be measured.

"Confusion is added by the Defendant's assertion that 'if the actual work performed has a value or price or cost to the consumer less than that estimated, then the consumer should only pay that which is the lesser.' While 'price' may be included in the term 'cost' where does 'value to the customer' come in? Such a term is nebulous at best, and when inserted into the statute it is apparent that reasonable minds would have to guess as to its meaning. The garageman has no way of knowing what the value of the repair is to the consumer. If the consumer knows he will pay only the value of the repair he will obviously state that the repair is of little value.

"Based on the preceding discussion the Court can only conclude that the statement 'if the actual cost of repair is less than the agreed on estimated cost, the customer shall pay only the actual cost' appearing in Section 32 of Public Act 300 is unconstitutionally vague."

disputed sentence is different from those of the parties and the trial judge, and therefore we begin with a slate cleaned of all except what the Legislature has written.

We begin with several familiar principles of statutory construction devised by the courts to assist them in negotiating the labyrinth of legislative linguistics. Statutes come to us cloaked with a presumption of constitutional validity. *Manistee Bank & Trust Co v McGowan,* 394 Mich 655, 667; 232 NW2d 636 (1975). In construing a legislative act, if more than one construction is permissible, that which sustains the legislation will be adopted. *Loose v City of Battle Creek,* 309 Mich 1, 13; 14 NW2d 554 (1944), *Evans Products Co v State Board of Escheats,* 307 Mich 506, 533–535; 12 NW2d 448 (1943) (collecting rules of construction). Courts should strive to sustain the validity of a statute, if that can be done without doing actual violence to the language used in the act, *People v Harper,* 1 Mich App 480, 483; 136 NW2d 768 (1965), *aff'd* 379 Mich 440; 152 NW2d 645 (1967), *appeal dismissed,* 392 US 644; 88 S Ct 2296; 20 L Ed 2d 1353 (1968), and whenever possible, an interpretation that does not create constitutional invalidity is preferred to one that does. *Schwartz v Secretary of State,* 393 Mich 42, 50; 222 NW2d 517 (1974). The rule requiring us to choose a constitutional reading of the statute applies when the language is ambiguous, *Brown v Saginaw Metal Casting,* 68 Mich App 85, 89; 241 NW2d 769 (1976), and the presumption of constitutionality may justify even a construction that is rather against a natural interpretation of the language used, if necessary to sustain the enactment. *People v Bandy,* 35 Mich App 53, 57; 192 NW2d 115 (1971). Courts prefer to impute to the Legislature an

absence of intention to take private property without just compensation therefor, on the assumption that the Legislature would not designedly commit an act of injustice. *Pigorsh v Fahner,* 386 Mich 508, 514; 194 NW2d 343 (1972). It is also well settled that a statutory interpretation that leads to an absurd result should be avoided. *In re Lambrecht,* 137 Mich 450, 454; 100 NW 606 (1904).

In construing a statute the words used are given their ordinary meaning. *American Telephone & Telegraph Co v Employment Security Commission,* 376 Mich 271, 279; 136 NW2d 889 (1965). Here the asserted ambiguity results from the use of the words "cost" and "actual cost" in the last sentence of § 32(1). Throughout the preceding four sentences of § 32(1) the terms "price" or "estimated price" are used. The trial judge concluded that the change in terminology had some unfathomable significance that rendered the last sentence unconstitutionally vague, but once it is recognized, first, that the words "price" and "cost" are used interchangeably in common usage,[18] and, secondly, that it is only after a repair is completed that the actual cost to the customer can be computed, we see no insuperable obstacle to a constitutional construction of § 32(1).

Although good legislative draftsmanship would ordinarily call for use of the same term throughout the statute, the alteration in point of view that

---

[18] Webster's Third New International Unabridged Dictionary (1964) defines "price" as "the quantity of one thing that is exchanged or demanded in barter or sale for another: a ratio at which commodities and services are exchanged", or "the amount of money given or set as the amount to be given as a consideration for the sale of a specified thing". "Cost" is defined as "the amount or equivalent paid or given or charged or engaged to be paid or given for anything bought or taken in barter or for service rendered: *Charge, price".* (Emphasis added.) "Actual cost" is "cost based on the most factual allocation of historical cost factors" and "estimated cost" is "cost in cost accounting estimated in advance of production or construction".

occurs between the time a repair is contemplated (estimate price) and the time the repair is completed (actual cost) explains the shift in terminology. It must be remembered that under the act the whole process of performing repairs begins with an estimate, which Websters Third New International Unabridged Dictionary (1964), defines as "a judgment made from usually mathematical calculation especially from *incomplete data: a rough or approximate calculation* (as of the number, amount, or size of anything)". (Emphasis added.) Having performed the repair, the repair facility is now in a position to compute the actual cost to the consumer of the service performed. It may be that in the course of the repair a part that was thought to need replacement will have been found serviceable. In that case, the "actual cost" of repair is the "estimated price" less the cost (included in the estimated price) of the part that was not replaced. The estimated price also might be reduced by discovering, in the course of performing the repair, that a given operation, for which a labor charge was included in the estimated price, does not have to be performed, as, for example, when a part thought to need replacement or repair actually does not. In that case, the "actual cost" to the consumer is the "estimated price" less the cost of the part not replaced and the labor charge included in the estimated price for its replacement.[19]

_____

[19] This is not to say that the repair facility cannot charge the consumer for the labor expended in determining that the part did not need replacement. Nor do we see anything in the act that would forbid a repair facility to compute its labor charges based on the "flat rate manual" compiled by automobile manufacturers for use in computing payments to dealers for repairs performed in fulfillment of the manufacturer's warranty, so long as that method of computation is disclosed to the customer upon request. *See* 1976 AACS R 257.136(1). We do not perceive any legislative intent to penalize a repair facility for its efficiency, and it would seem to be in the manufacturers' interest to ensure that such "flat rates" are reasona-

Just as § 32(1) permits the repair facility a margin of estimational error in its favor,[20] so it grants the customer the benefit of actual savings under the estimated price.

We construe the disputed sentence as follows: "If the actual cost of repair (being the sum of the cost to the consumer of parts actually used and labor actually required) is less than the agreed upon estimated cost, the customer shall pay only the actual cost." So construed, the provision is not vague, circular, nor absurd. It does not take from the repair facility that margin of profit to which it is rightfully entitled. It means that the repair facility is entitled to be paid for the parts and services it actually provides, and that the customer is required to pay for only those parts and services he or she actually receives. This was manifestly the Legislature's intent, however inartfully that intent may have been expressed, and it requires no great creative genius, but only common sense, for us to effectuate that intent.

## CONCLUSION

As we have sustained those portions of the act held unconstitutional by the trial judge, the other questions raised on appeal need not be discussed.

---

ble approximations of the time required for a normally skilled mechanic to perform the repair. On the other hand, if labor charges included in the estimated price are actual estimates of the time required ("judgment times"), rather than "flat rates", as plaintiff Ramsay testified they sometimes are when the flat rate manual does not list a given operation, and the actual time it takes to perform the operation is less than the estimated time, the consumer is entitled to the benefit of this error in judgment, and under the act he may be charged only for the actual time it took to perform the operation.

[20] "If a waiver is not signed as provided in subsection (3) and the estimated price is exceeded by not more than 10% or $10.00 whichever is lesser, the written or oral consent of the customer for the excess charge need not be obtained unless specifically requested by the customer." MCLA 257.1332(1); MSA 9.1720(32)(1).

We express no opinion on the wisdom of the act, other than to observe that it reflects a comprehensive effort by the Legislature to remedy some of the defects in the law that prompted our comments in *People v Wilde, supra,* at 518. Inasmuch and insofar as it is constitutional, the act must be effectuated likewise by the courts.

The judgment below is reversed. No costs, a public question involved.

Allen, J., concurred.

H. L. Heading, J. *(concurring in part, dissenting in part).* The parties appeal by right from the circuit court's summary judgment for plaintiffs holding unconstitutional several provisions of the Motor Vehicle Service and Repair Act. MCLA 257.1301 *et seq.;* MSA 9.1720(1) *et seq.* The circuit judge permanently enjoined the Secretary of State from implementing or enforcing the provisions held unconstitutional.

Plaintiffs maintained and the trial judge agreed that the legislative scheme allowing the administrator to make rules, investigate alleged violations, prosecute, adjudicate, and impose sanctions results in such a commingling of powers as to constitute a deprivation of due process under the Michigan Constitution.

The majority holds that this scheme which permits the administrator to make rules, investigate, prosecute, adjudicate and impose sanctions is constitutional. I disagree. I adopt the trial judge's reasoning and concur with his conclusion that the scheme violates due process of law and is therefore unconstitutional. I do not feel that it is necessary for me to comment further because the trial judge's opinion is well reasoned.

As to the second and third points discussed in the majority opinion, I concur.